**[Cite as *State v. Orr*, 2011-Ohio-6269.]**

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 96377**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MAXIE ORR, JR.

DEFENDANT-APPELLANT

**JUDGMENT:
AFFIRMED**

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-541628

**BEFORE:** Sweeney, J., Kilbane, A.J., and Boyle, J.

**RELEASED AND JOURNALIZED:** December 8, 2011

## ATTORNEY FOR APPELLANT

Ruth Fischbein-Cohen, Esq.
3552 Severn Road, Suite 613
Cleveland Hts., Ohio 44118

Maxie Orr, Jr., Pro Se
No. 600-040
Lorain Correctional Institution
2500 S. Avon Belden Road
Grafton, Ohio 44044

## ATTORNEYS FOR APPELLEE

William D. Mason, Esq.
Cuyahoga County Prosecutor
By: John P. Colan, Esq.
Assistant Prosecuting Attorney
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

JAMES J. SWEENEY, J.:

{¶ 1} Defendant-appellant Maxie Orr appeals from his nine year prison

sentence that was imposed for his convictions of firearm specifications,[1]

---

[1] The trial court merged the one year firearm specifications contained in counts 1 through 4 with the three year firearm specifications in the same counts.

attempted murder,[2] aggravated robbery,[3] theft, carrying a concealed weapon, and discharge of a firearm on or near prohibited premises. Defendant asserts that his convictions for attempted murder and aggravated robbery should have been considered allied offenses and merged; that the trial court did not properly advise him of postrelease control; and that his convictions were against the manifest weight of the evidence. For the reasons that follow, we affirm.

{¶ 2} Defendant was charged with committing multiple offenses. He waived a jury trial. At trial, Larry Finley testified that he made arrangements to meet with his friend, the co-defendant herein, Deon Washington, with the intention of selling his car stereo equipment to Washington's friend.

{¶ 3} Larry's brother, David, accompanied him to Bosworth Gardens in Cleveland to meet the men around 5:30 or 6:00 p.m. on August 23, 2010. It was daylight. Larry knew both the defendant and the co-defendant from the neighborhood; however, he did not know defendant's name at that time.

---

[2]The trial court merged defendant's conviction for felonious assault under count 3 with his conviction for attempted murder under count 1.

[3]The trial court merged defendant's conviction for kidnapping under count 4 with his conviction for aggravated robbery under count 2.

{¶ 4} Larry's testimony described the incident as follows: defendant "pulled out a gun, [and said] 'Give me everything,' he starts going through my pockets. * * *

{¶ 5} "And, he grabs my car keys from the car, I hear my car shut off is how I know he grabbed my car keys; hits me with the gun and takes off running. *** I yell to my brother, 'They got my keys' * * *

{¶ 6} "* * *I take off to chase after these guys. The whole time that I'm chasing after these guys I'm continuously yelling, 'I'm going to catch you, I'm going to catch you, I'm going to get you,' I mean, I'm yelling absurd things.

{¶ 7} "I get probably 15 feet within these guys and Deon says, 'Bust that bitch,' and Maxie turns around, without hesitation, cocks back, and takes a shot at me."

{¶ 8} When asked how certain he was that defendant and the co-defendant were the persons involved, Larry said, "150 percent, sir, without a doubt."

{¶ 9} Larry stated that defendant took his cell phone and $356.00 of his money. Larry clearly saw defendant brandish a gun that he described as a "small caliber" possibly a .22; "a little chrome hand pistol."

{¶ 10} There was a third man present with defendant and co-defendant who fled when defendant pulled out the pistol.

{¶ 11} Larry decided to chase defendant and the co-defendant because they took his car keys. He thought if defendant was facing away from him, defendant could not shoot him. But when the co-defendant said "Bust that bitch," defendant "stop[ped] cold turkey, turn[ed] around, and bust[ed] the gun" which Larry explained meant defendant shot at him. Larry heard a loud bang. Larry was asked, "How can you be sure it was [defendant] that fired the gun?" to which he responded, "Because when he was turning and I was turning I could see him turning with an object in his hand." Larry and his brother returned to Bosworth Gardens where he indicated he had not been shot but wanted someone to call the police. Larry then found his car keys and drove to the co-defendant's girlfriend's house. The co-defendant was not there so Larry decided to report the incident to the police.

{¶ 12} Larry dropped off his brother who did not want to go to the police station because he had outstanding warrants. Larry proceeded to the police station where he reported the incident but did not mention that his brother David had been present. Larry described defendant as "five-six, five seven" approximately 135 pounds with a short hairstyle "beginning to be dreads." Larry gave a recorded statement as well and also identified defendant from a photo lineup; which is contained in the record as State's Exhibit B. He was able to "immediately" identify defendant's photo as the person who held a gun to his face.

{¶ 13} Shell casings were recovered from the area where Larry claims defendant shot at him.

{¶ 14} Telephone records corroborate Larry's testimony that there was communication between his phone and the co-defendant's phone. Larry admitted on cross-examination that he may have made a "misperception of time" as to when exactly he had been on the phone with the co-defendant in relation to when they met at Bosworth Gardens. Larry states he informed the police that he was making estimates of time because he was not sure of it. Larry further explained that he had to stress the importance of this matter in order to get his brother David to testify at court. Larry described his brother David as a "runner from the law."

{¶ 15} David did appear to testify in this case. David indicated that he knew co-defendant Washington and has even lived with him at times. On August 23, 2010, David was staying with his brother Larry. He said he does not have a good relationship with Larry. David described Larry as being more responsible, while he prefers to slack and party. In fact, David testified that he was going to be arrested after testifying because he had an outstanding warrant. David stated he was charged with falsification for using Larry's name and Larry pressed charges. Nonetheless, David appeared for court; stating he understood he needed to tell the truth in this case.

{¶ 16} On August 23, 2010, David was with Larry when they stopped to meet Washington regarding the stereo system. He saw three men, including Washington, defendant and "another guy." He identified both defendants and was "a hundred percent certain." David was talking to Washington as defendant was with Larry at the back of the car. David heard something going on, turned around and saw the third man running away. As David attempted to get out of the car, Washington said, "Don't think about it, he'll squeeze that shit." David assumed Washington meant defendant had a gun. David stayed in the car and defendant reached inside to grab the car keys. David saw a chrome gun in defendant's left hand. He wrestled with defendant trying to keep hold of the keys but defendant took all but the name tag. Larry was yelling "They got my keys, they got my keys, they got my keys." They also took Larry's cell phone and money. David and Larry chased them. He heard Washington yell, "Bust that bitch." Defendant was about 15 feet from Larry when he turned, aimed and shot the gun at them.

{¶ 17} David and Larry ran the opposite way back to the car, where they discovered the car remote and then saw the key was still in the ignition. An African-American woman offered to call 9-1-1 and the brothers got in the car and went to Washington's "baby momma's mom house." David guessed they arrived there around 5:10 p.m. Later he testified that the incident occurred in the "mid evening" around five or six o'clock. The defendants were not there so

Larry dropped David off on his way to the police station. David went home, told his mother, and "steady" called Washington's phone with his mother's phone. This was about twenty minutes after the incident. State's Exhibit A indicates that the first call from David's mother's phone to Washington's phone after the incident, occurred at 18:29 military time (6:29 p.m.).

{¶ 18} No one promised David anything in exchange for his testimony and he said he was scared about being arrested for the warrant.[4] Under cross-examination, David indicated he had a fight with Washington in 2009 where David was injured and life-flighted to the hospital. David said they had reconciled since the fight. David also confirmed he has a criminal record.

{¶ 19} The police officer who took Larry's report testified. Larry told him about how he was robbed during a meeting to sell his speakers. Larry identified the suspects, including providing Washington's name. Larry reported his phone and $350-360 was stolen from him. Larry reported that the incident occurred at 6:45 p.m. and he made the report at 9:40 p.m. (which is the time the report was completed). It is "highly possible" that Larry waited in the police lobby for two hours before he made the report. The police

---

[4]Det. Clayton testified that he told David he was not going to arrest him but did not know what anyone else intended.

log indicates he signed in at 7:30 p.m.[5]   Larry did not report being hit with the gun.

**{¶ 20}** Detective Clayton testified that he was assigned this case on August 24, 2010.   He contacted the victim, Larry Finley, who made a statement.   Det. Clayton said Larry's trial testimony was "very consistent with what he gave [him] in the statement."   He did tell Det. Clayton that he had been pistol whipped, however, Det. Clayton did not include everything Larry told him in his final report. The detective and Larry returned to the crime scene and located a shell casing in the area where Larry said defendant had shot at him. It was a .22 caliber casing.   No fingerprints were found on the casing.   Washington was arrested on August 31, 2010. At that time, he was in the company of defendant and another man.   Defendant and the other man both had outstanding warrants and were, therefore, also arrested on that date. Defendant did match the description of the other suspect in the Finley robbery. However, at the time of trial defendant's characteristics had changed; according to Det. Clayton, defendant's hair was completely different. Larry was contacted to review a photo array containing defendant; who he positively identified as the person who had robbed him.

---

[5]Det. Clayton testified that this does not mean he arrived at the time. He may have been there before realizing he had to sign in.

{¶ 21} Det. Clayton identified a potential suspect of the third man who was on the scene but did not have enough to obtain an arrest warrant. The third individual was not "actively involved in the robbery."

{¶ 22} Washington denied the allegations to police. Washington's phone records confirmed calls placed between Washington and Finley on the day in question.

{¶ 23} The trial court denied defendant's motion for acquittal.

{¶ 24} Defendants presented the testimony of Brenda DiNickle. Her daughter Britanni lived with co-defendant Washington in August of 2010. She confirmed that Larry and Washington were friends. At some point in August, Larry came looking for Washington and, upon learning he was not present, Larry said, "Tell Deon go back to Florida 'cause we're gonna' kill him." This occurred in the evening time and Larry was with another person who looked like him. The men were very upset. Brenda does not know David. Although she was concerned, Brenda called Britanni but did nothing further.

{¶ 25} Deon Washington also testified. He confirmed that he grew up with Larry Finley but does not currently consider them friends. They have not been friends since David was injured in 2009. Washington did have a phone conversation with Larry on August 23, 2010 but denies talking to him about speakers. He lived at Bosworth on that day and he returned there around 5:30 p.m because people were allegedly threatening his life in that

area. His intention was to find the people who were going to kill him; who he believed to be Larry Finley. He called Larry a few times and they had a few "heated" conversations. He called a few other friends to back him up but he was not concerned for his safety. But, he did not see Larry at Bosworth. Washington was not sure if he saw defendant that day.

{¶ 26} Washington said he could never be friends with the Finleys after what happened to David. Yet, he continued to speak with them on the telephone. Washington said he changed his phone number, which he can do "every five minutes if [he] want[s] to." He denied any involvement in the robbery of Larry Finley and insisted he never spoke to him about the purchase of his car speakers.

{¶ 27} LaChelle Pearl testified that defendant is her son. On August 23, 2010, she was at home and said that defendant was on the couch sleeping. This was around six o'clock in the evening. She recalled defendant having a bad toothache and being with her most of the day but he did run some errands for her. He left the house sometime after four o'clock and returned around 5:30 p.m. Defendant and his brother left the house later but it was still daylight; she estimated it was around 9 p.m. She thinks they went to play basketball. Pearl said defendant did not have a gun, nor did he own one. Pearl testified that although she loves her son, she would not lie for him. She was not with defendant between four-thirty and six-thirty that day but

believed he was at the store.   Defendant's 14 year old brother testified that he went to the store (Dave's)   with defendant on August 23, 2010 around two-thirty and they were gone about an hour.   After returning home, defendant left the house with another brother around "sixish, seven." Defendant's 26 year old brother testified that defendant had a toothache on August 23, 2010. He stated defendant and the younger brother went to the store (GFS) but thought it was sometime after 3:30 or 4:00 p.m. They returned about 40 minutes later.   Then he and defendant went to the store again around 5:30.   He was with defendant all night and said they were delivering food to family members.

{¶ 28} Defendant also testified.   On August 23, 2010, he was at home and awoke around 3:30 p.m.   He had a toothache and was running errands for his mother. He went with his little brother to the store (GFS). Then he made another run to the store to pick up more ingredients.   He did not go out again that evening. He does not own a gun. He denied any participation in the robbery of Larry Finley and had never seen him.   Defendant does know Washington and is friends with him.   Under cross-examination, defendant indicated his family was preparing for "Friday's dinner"; however, did not dispute that August 23, 2010 was a Monday. When questioned about this discrepancy, defendant said he was "preparing for Friday's dinners as stated already."   Defendant confirmed that he heard his brother testify that they

were delivering the dinners that night and explained that those dinners were not the "Friday's dinner." He first went to the store with his younger brother around 4:30 p.m. and was gone for about an hour. He gave his mom the receipt. He went to the store again an hour later. Once he returned, he did not leave again. When questioned about delivering dinners with his brother, however, defendant changed his testimony and said he did deliver some dinners.

{¶ 29} The trial court detailed its findings including that the cell phone records show that at 5:03 p.m. on August 23, 2010, Washington's cell phone called Larry Finley's cell phone for two minutes. Another call occurred at 5:27 p.m. and lasted for two minutes. A third call was made at 5:54 p.m. but lasted 38 seconds. Also phone records corroborated the testimony that multiple calls were placed from the Finleys' mother's phone to Washington's phone (13 successive calls between 6:29 to 6:33 p.m. and 47 calls between 6:33 p.m. and 6:46 p.m.) Police records reflect that Larry Finley signed in at 7:30 p.m. and indicated he waited two hours to speak to an officer. Larry positively identified defendant from a photo array within 30 seconds of reviewing it. Brenda DiNickle stated that Larry and someone else who looked like him came over looking for Washington. While Washington indicated his presence at Bosworth Gardens to meet Larry around 5:30, he denied it had anything to do with purchasing or selling a stereo and maintained that Larry never

showed up. The court recounted the testimony offered by defendant and his witnesses.

{¶ 30} The court found the evidence offered by the state's witnesses was more credible than the evidence presented against it. The court found defendant guilty on all counts, merged certain counts and sentenced him as stated. Defendant presents the following errors for our review.

{¶ 31} "Assignment of Error I: The court erred in separately convicting appellant on allied offenses of similar import."

{¶ 32} The current analysis for determining whether offenses qualify as allied offenses subject to merger pursuant to R.C. 2941.25 is set forth in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061.

{¶ 33} "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

{¶ 34} "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' Brown,

119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶50 (Lanzinger, J., dissenting).

{¶ 35} "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

{¶ 36} "Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R .C. 2941.25(B), the offenses will not merge." Id. at ¶48–51, 895 N.E.2d 149.

{¶ 37} Defendant maintains that his convictions for attempted murder, aggravated robbery, felonious assault, and kidnapping, together with the firearm specifications were all allied offenses of similar import subject to merger under the statute.

{¶ 38} The trial court did merge the felonious assault conviction into the attempted murder conviction and also merged the kidnapping conviction into the aggravated robbery conviction. Therefore, the issue now is whether the attempted murder and the aggravated robbery convictions, and their separate firearm specifications, should merge as well. Applying the merger analysis to the facts, they should not. The record evidence reflects that the aggravated robbery was completed before defendant shot at Larry Finley. Accordingly,

the offenses were not committed with the same conduct and should not be merged. This assignment of error is overruled.

{¶ 39} "Assignment of Error II: The court erred in sentencing by not explaining to Appellant post release control as required by ORC 2967.28."

{¶ 40} Defendant asserts that the trial court did not properly advise him of post-release control because he allegedly did not address it in terms of each count separately. However, at the sentencing hearing the court advised that "felonies of the 1st degree * * * [carry] a mandatory five years of post-release control.* * * Felonies of the 2nd degree * * * [carry] a three-year mandatory post-release control sanction associated with that charge * * *The felonies of the 3rd degree * * * [are] subject to three years post-release control, discretionary with the Adult Parole Authority.

{¶ 41} "Felonies of the 4th degree * * * are * * * also subject to three years of post-release control."

{¶ 42} The court then imposed the following sentence: a three year prison sentence for attempted murder plus a three year consecutive term for the firearm specification; a three year prison term for aggravated robbery plus a three year consecutive term for the firearm specification; 180 day jail term for theft; an 18 month sentence for carrying a concealed weapon; and a one year prison term for discharging a firearm at or near a prohibited premises. The court ran all counts concurrent with each other but consecutive to the terms

imposed on each firearm specification, which resulted in an aggregate sentence of nine years (three years on the base charges plus three year term for firearm specification on count 1 plus three year term for firearm specification on count 4).

{¶ 43} Additionally, the court advised, "because the felony one subjects you to post-release control, which is mandatory, with the Adult Parole Authority, I do have to advise you that when you are placed on post-release control, after completion of your sentence, again, it will be a five-year period. Terms and conditions will be placed upon you by the Adult Parole Authority.

{¶ 44} "If you violate any of those terms and conditions, then you can be sent back to prison for up to one half the original sentence. In this case, original sentence is nine years; that would be four and a half years total time that you could be sent back to the institution and any time spent back in the institution for violations of post-release control would not be credited towards any remaining period on post-release control.

{¶ 45} "Also, I will advise you that failure to report to a parole officer may give rise to a separate charge of escape, which is a felony of the 3rd degree. * * *"

{¶ 46} Defendant believes that the trial court should have imposed separate terms of postrelease control for each conviction.

{¶ 47} Defendant relies on *State v. Saxton*, 109 Ohio St.3d 176, 2006-Ohio-1245, 846 N.E.2d 824, and contends the trial court "grouped" the offenses and packaged them in one sentence by informing defendant that his sentence included a five year mandatory period of postrelease control. This is not the case. The trial court correctly imposed separate sentences for each offense. *Saxton* does not address the imposition of multiple periods of postrelease control but held that it is error for an appellate court to modify a sentence on a conviction that was not the subject of the appeal. Id. ("R.C. 2953.08(G)(2) permits the court to modify or vacate only a sentence appealed under that section. In this case, the appellate court exceeded its authority by essentially considering an assignment of error not raised and vacating a sentence not appealed.")

{¶ 48} R.C. 2967.28(F)(4)(c) address the imposition of postrelease control in cases that involve multiple convictions and sentences as follows:

{¶ 49} "(c) If an offender is subject to more than one period of post-release control, the period of post-release control for all of the sentences shall be the period of post-release control that expires last, as determined by the parole board or court. Periods of post-release control shall be served concurrently and shall not be imposed consecutively to each other."

{¶ 50} The statute precludes the court or the parole board from imposing more than one period of postrelease control in cases that involve multiple

convictions. Accordingly, the trial court's imposition of a five year term of postrelease control was proper. *Durain v. Sheldon*, 122 Ohio St.3d 582, 2009-Ohio-4082, 913 N.E.2d 442. This assignment of error is overruled.

{¶ 51} "Assignment of Error III: The conviction was against the manifest weight of the evidence."

{¶ 52} Defendant generally contends that a finding of guilt in this case was against the manifest weight of the evidence; presumably contending all of his convictions were in error.

{¶ 53} To warrant reversal of a verdict under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

{¶ 54} Reversal of defendant's convictions is not warranted under this standard.

{¶ 55} The judge exhaustively, and accurately, recounted the evidence that was presented in the record. Then, it spread upon the record its findings. The court found the victim's testimony more credible than the evidence offered by the defense. Defendant questions the fact that the police did not arrest the

third person. Defendant suggests that defendant's convictions are against the manifest weight of the evidence because the third person was not identified. But, the record is quite clear that the third person ran as soon as the gun was drawn and did not participate in the ensuing events or the foot chase among the defendants and the victims. Even if a third person was apprehended and charged in this case we do not see how that would diminish the significance of the evidence that was presented against defendant or the weight that the trial judge chose to afford it. The victims' testimony was significantly consistent and the phone records and police records supported it. While there was some testimony of bad blood between co-defendant Washington and the victims, there was nothing offered to suggest any reason for the victims to falsely accuse defendant of committing any offenses against them. Yet, they were both certain that it was defendant (not Washington) who was the principle offender that brandished and fired the gun at them. This is not a case in which we could possibly find that the fact finder clearly lost its way in rendering its verdicts.

Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's

conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


JAMES J. SWEENEY, JUDGE

MARY EILEEN KILBANE, A.J., and
MARY J. BOYLE, J., CONCUR