[Cite as *State v. Ranzy*, 2012-Ohio-2763.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97275**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ANTWONETTE RANZY

DEFENDANT-APPELLANT

**JUDGMENT:**
**AFFIRMED IN PART; REVERSED IN PART AND REMANDED**

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-540773

**BEFORE:** Sweeney, J., Celebrezze, P.J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** June 21, 2012

**ATTORNEY FOR APPELLANT**

Russell S. Bensing, Esq.
1350 Standard Building
1370 Ontario Street
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

William D. Mason, Esq.
Cuyahoga County Prosecutor
By: John Wojton, Esq.
        Nicole Ellis, Esq.
Assistant Prosecuting Attorneys
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

JAMES J. SWEENEY, J.:

{¶1} Defendant-appellant Antwonette Ranzy ("defendant") appeals her convictions for aggravated robbery, kidnapping, attempted murder, and related gun specifications. For the reasons that follow, we affirm the convictions, reverse as to sentencing on the aggravated robbery and kidnapping convictions, and remand for resentencing.

{¶2} On September 17, 2008, the alleged victim, Isaiah Randle ("Randle"), left his apartment located on East 123rd and Harvard Avenue sometime before 6:00 a.m. for work. He exited from the back door into the parking lot and was getting into his car. According to Randle, codefendant Quentin Vanderhorst ("Quentin" or "Vanderhorst")[1] put a gun to his head and demanded his keys. Randle offered him $20 instead. Defendant told him to turn over the keys or she would have Quentin shoot him.

{¶3} Randle recognized defendant as his former girlfriend, and he also knew Quentin.

{¶4} When Quentin took his eyes off of Randle, Randle decided to run. In the process, he tackled Quentin and fell to the ground. Randle heard a "ting, like a bing, a constant tinging noise" and thought he "done shot me in the head."

{¶5} Randle got up and ran in a zigzagging fashion down Harvard to E. 131st St., up to Miles Road. As he fled, Randle sustained another gunshot wound to his shoulder.

{¶6} Randle called his friend Michael Shepherd and told him Nettie and Quentin

---

[1]Quentin's separate appeal is addressed by this court in *State v. Vanderhorst*, 8th Dist. No. 97242, _____-Ohio-_____.

just tried to rob and kill him. Randle also called 911 as he continued to seek help. EMS arrived and transported him to the hospital ("Metro"). During transport, Randle told the EMT that he knew who had shot him, but refused to give their names.

{¶7} Randle sustained two gunshot wounds — one to the head, which could not be removed, and one to the shoulder. When the police arrived at the hospital, they accused Randle of shooting back, which he denied. Randle offered to submit to gun residue testing, but the officer decided not to conduct the test due to his belief that Randle's hands had been contaminated by contact with others.

{¶8} Initially, Randle told police he recognized but did not know his assailants. Randle testified it was his intention to handle the matter with "street justice." However, upon the advice of his mother, Randle changed his mind and reported that defendant and Quentin had committed the offense.

{¶9} The state called two witnesses who reported being at a nearby bus stop when the shooting occurred. Linda Briggs ("Briggs") saw Randle starting his car in the lot, which was well lit. She then saw a young female peeking around the building and thought they must be leaving together. Soon after, she saw the young female with another male heading towards Randle's location. Then the three people were "tussling" and shots were fired. Briggs, who was at the bus stop with another man, could not run due to a cast being on her foot. She hit the ground and hoped they would not harm her. She saw the young girl and man with a gun running past as if one was pulling the other saying "hurry up, he's getting away." They were both wearing black, with a red hoodie. Briggs described the girl as being thin and young. Briggs immediately called 9-1-1 and reported that they were shooting at each other. Briggs, however, adamantly testified that there

was only one gun. She said her statements to 9-1-1 otherwise were the result of being so scared.

{¶10} The other person at the bus stop was Tyrone Simon ("Simon"). Simon missed his usual bus and was waiting for the 6:10 a.m. bus to arrive. He was waiting with a young woman. He saw a man and a woman standing together in the front of the apartment building. They were wearing black. The female had a red scarf with yellow flowers on her head, and the male had on a black hoodie. Simon did not see the male's face. He estimated the female was about five feet four inches and the male was about six feet tall.

{¶11} Simon identified defendant as the female that he saw that day. He selected her from a photographic array presented to him by Detective Evans and also identified her in court. He was certain it was her. Simon was not able to identify the male shooter because he did not see his face.

{¶12} Simon does not know Randle but thought he was the maintenance man for the apartment. Randle usually went out the front door, but that day he exited from the rear. Simon heard defendant say, "He's going in the back — he's going out the back way, let's go, let's go get him." Simon heard arguing, then he saw Randle being chased by the male and defendant. He saw Randle run down Harvard to E. 131st, then toward Miles Road. He also only saw one gun in the hands of the male in the hooded sweatshirt.

{¶13} Simon testified to his belief that defendant was Randle's ex-girlfriend. It is unclear from the record why he made that assumption.

{¶14} Simon described the weather as warm and mild with bright lighting in the area.

{¶15} After witnessing this event, Simon caught the 6:10 a.m. bus to work. Several days later, an officer contacted Simon at work to inquire about the shooting. The officer came to his house where Simon was presented photo arrays. Simon recalled seeing 12 women and 12 men. The officer testified that Simon was shown only six of each, in two separate arrays. Simon identified defendant, but could not identify a male. He was not rushed or pressured in any way by the officer to make an identification.

{¶16} Randle was presented the same photo arrays, and he readily identified both defendant and Quentin, both of whom he knew prior to the incident.

{¶17} Det. Evans was assigned to investigate the shooting. Randle told Det. Evans that defendant and Quentin had committed the offenses. Det. Evans canvassed the crime scene area for witnesses, leaving his card on several homes. He received information from an anonymous witness that Simon had witnessed the shooting. Det. Evans testified during the suppression hearing that he left a card at Simon's residence and later received a call from Simon. At trial, Det. Evans said he obtained Simon's work number and initiated contact with him there. At trial, Det. Evans said he erred in his report as to how he came into contact with Simon. Simon testified that Det. Evans contacted him at work, and he had no idea how Det. Evans found him.

{¶18} Det. Evans went to Simon's home where he presented Simon with the photo arrays, from which Simon identified defendant as the female involved in the shooting of Randle.

{¶19} Det. Evans said that he made several unsuccessful attempts to contact Briggs but never spoke to her.

{¶20}  Det. Evans obtained arrest warrants for both defendant and Quentin. Quentin was arrested at his home on Durkee Ave., and defendant turned herself in to police at the Fourth District.

{¶21}  Additional substantive facts will be addressed where relevant to resolving defendant's assigned errors.

{¶22}  Defendant and Quentin were both charged in this case. Initially, defendant entered a guilty plea to one count of attempted felonious assault.  However at the sentencing hearing, defendant was allowed to withdraw her guilty plea.

{¶23}  The trial court denied defendant's motion to suppress the pretrial identification following an evidentiary hearing.

{¶24}  The matter proceeded to a jury trial where defendant's motions for acquittal were denied, and she was found guilty of all counts and specifications in the indictment. At sentencing, the trial court merged the two kidnapping and two aggravated robbery counts into one count of each; merged the one- and three-year firearm specifications into a single three-year firearm specification for the robbery/kidnapping counts; merged the two felonious assault counts into one, which was merged with the attempted murder counts; and merged the attendant firearm specifications into a single three-year firearm specification for the attempted murder counts.

{¶25}  The trial court then ordered defendant to serve an aggregate prison sentence of 13 years, which included two consecutive three-year terms on firearm specifications.  Defendant is also serving a four-year consecutive prison term for attempted murder and a three-year consecutive prison term for the remaining counts (robbery and kidnapping).

{¶26} Defendant timely appealed and presents six assignments of error for our review:

{¶27} "I: The Trial Court erred in failing to suppress the identification testimony of Tyrone Simon, in violation of Defendant's right to due process of law under the 14th Amendment to the Constitution of the United States."

{¶28} The defendant bears the initial burden of establishing that the photographic identification procedure was unnecessarily suggestive. If the defendant meets this burden, the court must consider whether the procedure was so unduly suggestive as to give rise to irreparable mistaken identification. *State v. Wills*, 120 Ohio App.3d 320, 324-325, 697 N.E.2d 1072 (1997), citing *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140; *State v. Garner*, 74 Ohio St.3d 49, 61, 656 N.E.2d 623 (1995).

{¶29} The court must determine whether the photographic identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

{¶30} Defendant contends that her identification was the result of a tainted procedure.

{¶31} There were inconsistencies between Det. Evans's testimony and Simon concerning the photo arrays. Particularly, Det. Evans said he showed Simon one photo array of six women and another photo array of six men. Simon believed, however, that he was shown two photo arrays of 12 women and two photo arrays of 12 men. Also, the documents indicate that another officer was present with Det. Evans at Simon's home, but Simon only recalled Det. Evans being there. Det. Evans could not remember if another

officer was there or not. These inconsistencies do not establish that Simon's identification of defendant was the product of a tainted procedure. Simon testified that the officer did not pressure him to make an identification, and there is no argument that the photos contained in the array unduly highlighted defendant. There is no evidence or allegation that Det. Evans did anything to influence Simon's identification of defendant.

{¶32} In contending that the pretrial identification was unreliable, defendant refers us to a growing trend of case law and legal treatises concerned with the questionable reliability of eye witness testimony. *E.g.*, *U.S. v. Smithers*, 212 F.3d 306, 412 (6th Cir.2000), citations omitted (noting that "[o]ne study has estimated that half of all wrongful convictions result from false identifications * * * '[i]t has been estimated that more than 4,250 Americans per year are wrongfully convicted due to sincere, yet woefully inaccurate eyewitness identifications.'" (Citations omitted.))

{¶33} Some courts have concluded that the current law applicable to determining the admissibility of eyewitness testimony is of questionable validity and not a dependable method of excluding unreliable identification testimony. *See New Jersey v. Henderson*, 208 N.J. 208, 27 A.3d 872 (N.J.2011). However, *Henderson* is not the law in Ohio, and our supreme court has yet to create any precedent that would allow us as an intermediate court to deviate from *State v. Broom*, 40 Ohio St.3d 277, 284, 533 N.E.2d 682 (1988). In *Broom*, the Ohio Supreme Court held that in determining whether a pretrial identification is unreasonably suggestive as to create a likelihood of misidentification, the following factors should be considered:

(1) [T]he opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by

the witness at the confrontation, and (5) the length of time between the crime and the confrontation.

*Id.*, citing *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243 (1977).

**{¶34}** A review of the "*Manson* factors" indicates that Simon's identification of defendant was reliable.

**{¶35}** Simon testified that he first noticed defendant standing in the doorway of the apartment building. He noticed her to the point he could recall what she was wearing, including a red scarf with yellow flowers. He saw her face. His description of the female's clothing was consistent with and more detailed than Briggs's description of her. Simon was certain of his identification of defendant. Furthermore, he did not identify a male suspect from the photo array because he admitted he had not seen the man's face. This demonstrates that Simon was not willing to make an identification in this case for the mere sake of doing so and without a level of certainty. A relatively short time passed between the shooting and Simon's identification of defendant.

**{¶36}** Defendant did not establish that the pretrial identification was the result of an unduly suggestive procedure or that it was unreliable. The trial court did not err by denying the motion to suppress the pretrial identification. This assignment of error is overruled.

**{¶37}** "II: The Trial Court erred in denying Defendant the use of Isaiah Randle's prior statements for impeachment purposes, in violation of Defendant's right to confrontation under the 6th and 14th Amendments to the Constitution of the United States."

**{¶38}** Defendant argues that the trial court denied her the opportunity to

cross-examine Randle about prior statements he had made during the sentencing hearing. Defendant believes that the jury would have acquitted her if the jury heard inconsistencies between Randle's trial testimony and the unsworn statements he made at the sentencing hearing. The inconsistencies she cites pertain to what transpired the night before the robbery and shooting occurred. Even if relevant for purposes of impeachment, the trial court did not preclude defendant from pursuing this avenue of cross-examination.

{¶39} The defense raised the issue before trial and requested that the state be precluded from informing the jury that the statements were made at a sentencing hearing. The state objected that if the defense addressed the statements with Randle, the state should be allowed to establish the circumstances in which the statements were made. The trial court definitively ruled that the state could not suggest that defendant had been in court for sentencing. While the trial court did express some reservations as to whether it should allow cross-examination based on the statements Randle made at the sentencing hearing, it ultimately said,

> * * * I have to mull this over as to whether or not I'll permit you to use that at all.
>
> * * *
>
> So I thought you should know my thinking on this. That's the context in which I am looking at this request by the defense. So absolutely the victim can't suggest, say he was in court for sentencing or something like that. We just can't allow that. And he should be admonished in the strongest terms in private by the State. *But beyond that, I'm not sure that I'm going to permit questioning based on what was said at sentencing.* (Emphasis added.)

{¶40} Based on the foregoing, the trial court did not prevent the defense from pursuing this line of questioning during Randle's cross-examination.

{¶41} To the extent the defense was under the impression that the court had limited it in this way, the issue has been waived. A trial court's ruling on a motion in limine is an interlocutory order. *State v. Grubb*, 28 Ohio St.3d 199, 200-202, 503 N.E.2d 142 (1986) (it is the potential treatment of an issue to be later resolved when it arises in the context of the trial where the trial court may change its mind based upon circumstances that are developed). Therefore, the parties must renew the motion or their objections to the preliminary ruling at the appropriate time during trial in order to preserve the matter for appellate review. *State v. Brown,* 38 Ohio St.3d 305, 528 N.E.2d 523 (1988), paragraph three of the syllabus.

{¶42} The defense engaged in a thorough cross-examination of Randle at trial. The defense did not attempt to cross-examine Randle about the alleged inconsistent statements he had made at the sentencing hearing. Because the defense did not renew any effort to elicit the subject testimony in the context of the trial, the matter was not preserved for appellate review. This is especially applicable in this case where the trial court had advised that it was unsure how it would ultimately resolve the matter beyond prohibiting any party from mentioning that the statements were made during a sentencing hearing.

{¶43} This assignment of error is overruled.

{¶44} "III. The Trial Court erred in entering a judgment of conviction that was against the manifest weight of the evidence, in violation of Defendant's right to due process of law under the 14th Amendment to the Constitution of the United States."

{¶45} To warrant reversal of a verdict under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving

conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

{¶46} Defendant contends that her convictions were against the manifest weight of the evidence because she asserts that Randle and Simon were not credible witnesses. Defendant further asserts that none of the other evidence supports the verdict.

{¶47} Defendant's convictions were not against the manifest weight of the evidence. While there are some inconsistencies in the evidence, we cannot say that the jury clearly lost its way in resolving them. Randle knew defendant as she was his former girlfriend. He also knew Vanderhorst. There is no dispute that Randle was shot and sustained injuries. Two independent eyewitnesses essentially described the same course of events. A man and a young woman were seen in front of the apartment shortly before shots were fired, Randle then fled down the street as these two people chased after him, continuing to fire shots.

{¶48} What defendant and Randle did the night before the shooting is somewhat unclear but not particularly relevant. Randle consistently identified defendant as one of his assailants even though he initially withheld their identities from the authorities with the intention of obtaining some type of "street justice." Significantly, Randle called Shepherd as he was running away and said that defendant and Vanderhorst committed the offense. This is a fact that Shepherd corroborated with his own testimony.

{¶49} Simon's testimony is somewhat questionable, such as how he reached the conclusion that defendant and the female assailant had been in a relationship. Particularly, in light of his testimony that he did not know either of them. And, there are discrepancies

surrounding his pretrial identification of defendant from the photographic arrays, albeit independent of the fact that he identified defendant as the female suspect. For example, how police identified him as the male eyewitness from the bus stop, the number of photo arrays presented to him, and whether Detective Martin was present during the identification process along with Detective Evans. Even if Simon's testimony is completely discounted, there was enough other evidence to support the jury's verdict.

{¶50} In addition, the defendants were able to present contrary exculpatory evidence to the jury. One witness said he saw both defendant and Vanderhorst asleep that morning in their own house. Defendant denied any involvement in the incident.

{¶51} It was within the jury's province to assess the credibility of the various witnesses. This assignment of error is overruled.

{¶52} "IV: The Trial Court erred in giving the jury a 'flight' instruction, in violation of Defendant's right to due process of law under the 14th Amendment to the Constitution of the United States."

> The decision whether to issue an instruction on 'flight' rests within the sound discretion of the trial court. Absent an abuse of discretion, the trial court's decision will not be reversed on appeal.
>
> A reviewing court may not judge a single instruction to the jury in artificial isolation. Rather, in determining whether a jury instruction constituted prejudicial error, an appellate court must determine, from the record, whether such instruction may have resulted in a manifest miscarriage of justice.
>
> Flight from justice 'means some escape or affirmative attempt to avoid apprehension.' It is well established that evidence of flight is admissible as tending to show consciousness of guilt. Thus, a trial court does not abuse its

discretion by issuing an instruction on flight if sufficient evidence exists in the record to support the charge. (Internal citations omitted.)

*State v. Benjamin*, 8th Dist. No. 80654, 2003-Ohio-281, ¶ 29-31.

**{¶53}** The substance of the instruction allowed for the jurors to determine whether there was any evidence of flight or not. The trial court instructed:

> There may be evidence in this case to indicate that the defendant fled from the scene of the crime. Flight does not in and of itself raise the presumption of guilt but it may show consciousness of guilt or a guilty connection with a crime. If you find the defendant did flee from the scene of the crime, you may consider this circumstance in your consideration of the guilt or innocence of the defendant.

**{¶54}** We cannot say that the trial court abused its discretion by providing this flight instruction based on the evidence presented in this case. *State v. Lozada*, 8th Dist. No. 94902, 2011-Ohio-823, ¶ 27.

**{¶55}** Whoever committed this crime, left the scene. It was defendant's position that she was never there and that she was not involved at all. However, there is contrary evidence to suggest she was there and that she chased Randle as Vanderhorst continued to fire shots at him. If the jury accepted defendant's evidence that she had not been there, then the flight instruction would have no effect. It was within the province of the jury to determine whether defendant's conduct exhibited a consciousness of guilt or not.

**{¶56}** Even if giving a flight instruction in this scenario is error, it was harmless in this case because it would not have changed the outcome. There was ample evidence of defendant's involvement in this incident.

**{¶57}** This assignment of error is overruled.

**{¶58}** "V: The Defendant was denied his [sic] right to due process of law, in violation of the 14th Amendment to the Constitution of the United States, by the misconduct of the prosecutor during trial."

**{¶59}** The Ohio Supreme Court has held that generally a prosecutor is allowed a certain degree of latitude during closing argument. *State v. Liberatore*, 69 Ohio St.2d 583, 589, 433 N.E.2d 56 (1982). In *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984), the court pronounced that "[t]he test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. * * *" *Id.* ("the prosecution [must] avoid 'insinuations and assertions which are calculated to mislead the jury.'") The misconduct of a prosecutor during trial is not reversible error unless it deprives the appellant of a fair trial. *State v. Maurer*, 15 Ohio St.3d 239, 266, 473 N.E.2d 768 (1984); *State v. DePew*, 38 Ohio St.3d 275, 528 N.E.2d 542 (1988).

**{¶60}** During closing arguments the prosecutor said, "And in fleeing immediately after the commission of this offense Linda Briggs testified she saw both Quentin Vanderhorst and Antwonette Ranzy running down Harvard Avenue." That was not Briggs's testimony. She saw a female and a male, but could not identify either of them. This is a significant misstatement, even if unintentional. But there was no objection to it.

**{¶61}** Absent an objection, it must rise to the level of plain error to merit reversal. Recently, this court has cautioned the prosecution to avoid insinuations and assertions that could mislead the jury, but still found that repeated instances of misstatements and mischaracterizations of the evidence did not deprive the defendant of a fair trial due to the "overwhelming proof of guilt and because the trial court instructed the

jury to follow the evidence." *State v. Hill*, 8th Dist. No. 95379, 2011-Ohio-2523, ¶ 41. However, where the evidence is not overwhelming, this court has reversed, based on cumulative error, where one of the errors included the prosecutor substituting its own testimony for that of the witness in closing argument. *State v. Williams*, 8th Dist. No. 95796, 2011-Ohio-5483.

{¶62} Considering the record as a whole, this was an isolated misstatement and, although wrong, did not qualify as plain error.

{¶63} The state also stated in closing arguments, "this has both one- and three-year firearm specifications." Upon objection, the jury was instructed as follows:

> Ladies and gentlemen, the matter of punishment or a sentence is not within the province of the jury. You will not consider what any punishment would be for any offense or specification in the indictment. And I ask that you ignore any references to it.

{¶64} Questions of punishment have no place in the trial of guilt or innocence. *State v. Dossett*, 2d Dist. No. 20997, 2006-Ohio-3367. The key consideration of a prosecutorial misconduct error analysis is the fairness of the trial, not the culpability of the prosecutor. *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 61.

{¶65} The trial court acted appropriately in sustaining the objection and providing a curative instruction on this issue. Accordingly, the misstatement did not deprive defendant of a fair trial when considered in context of the entire record.

{¶66} Defendant also cites to portions in the record where the trial court instructed the state to stop reading from a witness statement/police report and displaying it on the electronic monitor. The state argues that any error in this regard was harmless

pursuant to Crim.R. 52(A) due to the amount of remaining admissible evidence offered to prove defendant's guilt. We agree. Randle's testimony was consistent in all aspects relevant to the events that occurred on September 17, 2008. He knew both of his assailants and had recently broken up with defendant. He was clearly shot by a young woman and man, who he identified as defendant and Vanderhorst. The jury rejected the suggestion that Randle would falsely accuse defendant and Vanderhorst as some means of retribution for his failed relationship with defendant. Randle called Shepherd as the offense was ongoing and he was running for his life with bullets in his body. Even then, he identified defendant as one of the assailants, a fact corroborated by Shepherd.

**{¶67}** Based on the record, the errors asserted here were either corrected by the trial court or did not rise to the level of error that is required to merit reversal in this case. For those reasons, this assignment of error is overruled.

**{¶68}** "VI: The Trial Court erred in failing to merge the convictions for aggravated robbery with the convictions for kidnapping, and the convictions for aggravated robbery/kidnapping with the conviction of attempted murder, in violation of Defendant's right to due process of law under the 14th Amendment to the Constitution of the United States."

**{¶69}** The current analysis for determining whether offenses qualify as allied offenses subject to merger pursuant to R.C. 2941.25 is set forth in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061.

> In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the

conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' *Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶ 50 (Lanzinger, J., dissenting).

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R .C. 2941.25(B), the offenses will not merge.

*Id.* at ¶ 48–51, 895 N.E.2d 149.

{¶70}     Here, defendant was charged and convicted of both robbing and kidnapping Randle and holding him at gunpoint. The use of a weapon to forcibly rob someone naturally operates to forcibly restrain the victim's liberty at the same time. *Johnson* at ¶ 38.   Therefore, it is possible to commit both crimes with the same conduct. The more vexing issue is determining whether the two crimes were committed with the same or a separate animus. The syllabus law in *State v. Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345 (1979), provides some guidance in this task:

(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart

from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

**{¶71}** Applying this rationale, the evidence establishes that the offenses were committed with a "single state of mind" and that the restraint was merely incidental to the defendant's intention to rob Randle at gunpoint. The offenses of aggravated robbery and kidnapping are allied offenses of similar import.

**{¶72}** The attempted murder and aggravated robbery convictions, however, are not. These offenses were not committed with the same conduct or animus. Once Randle opted to try to escape or flee from the robbery, the defendant and Vanderhorst decided to escalate the matter and try to kill him. True, defendant failed to successfully rob Randle, but that failed attempt does not create an allied offense situation where the offender can shoot at the victim attempting to murder him based on the logic that the robbery was "ongoing." This is not a case where the gun was fired accidentally; there were clear purposeful efforts to kill Randle by shooting him in the head and then proceeding to chase after him while still firing the weapon. *State v. Orr*, 8th Dist. No. 96377, 2011-Ohio-6269, ¶ 38.

**{¶73}** This assignment of error is sustained in part and overruled in part. The aggravated robbery and kidnapping convictions are allied offenses of similar import and must merge.

**{¶74}** Defendant's convictions are affirmed, however, the sentence imposed for aggravated robbery and kidnapping is reversed, and this matter is remanded for resentencing on the merger issue. Upon remand, the state must elect which of the allied

offenses it wishes to pursue at sentencing. *State v. Whitfield*, 134 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182. The matter is affirmed in all other respects.

It is ordered that appellee and appellant split the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


JAMES J. SWEENEY, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
MARY EILEEN KILBANE, J., CONCUR