MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2016 ME 135
Docket:       And-15-147
Argued:       March 1, 2016
Decided:      August 16, 2016

Panel:        SAUFLEY, C.J., and ALEXANDER, <u>MEAD</u>, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

ALI M. MAHMOUD

MEAD, J.

[¶1]   Ali M. Mahmoud appeals from a judgment of conviction of one count of assault (Class D), 17-A M.R.S. § 207(1)(A) (2015), entered by the Superior Court (Androscoggin County, *Warren, J.*) after a jury trial.  On appeal, Mahmoud contends that the court committed prejudicial error by failing to give his proposed jury instructions on eyewitness identification.  We affirm the judgment.

I.  BACKGROUND

[¶2]   Viewed in the light most favorable to the State, the record establishes the following facts.  *State v. Cote*, 2015 ME 78, ¶ 2, 118 A.3d 805. On July 22, 2013, the victim, a tow-truck driver, and his friend were looking for illegally parked cars in Lewiston.  Around 11 p.m., the victim began loading

an illegally parked car onto his tow truck when the car's owner returned to the car and a verbal confrontation arose. Multiple people in the neighboring area gathered around, including Mahmoud. To assist with a language barrier between the victim and the car's owner, Mahmoud acted as a translator for about five minutes to facilitate a discussion about whether the "drop fee" would be reduced. After the confrontation began to escalate, the victim asked his friend to call 9-1-1. Mahmoud then attempted to punch the victim but missed, and the victim grabbed a six-foot-long metallic pole to defend himself, at which point Mahmoud walked away. The victim bent down to finish affixing the tow dolly to the vehicle when Mahmoud returned and kicked the victim in the face, fracturing his eye socket. The victim stood up and saw Mahmoud standing nearby "ready to fight."

[¶3] Immediately thereafter, police approached the area and Mahmoud ran a short distance away. Several police officers arrived at the scene and spoke with the victim, who described Mahmoud as a tall, Somali man wearing an orange hat, a gray shirt, and gray shorts. The victim then pointed to Mahmoud, who at that time was standing outside a building a short distance away. Contemporaneous with the victim's identification, a bystander gave the same description of the suspect to a different officer and also gestured toward

Mahmoud. As the officers approached Mahmoud, he started taking off running and ran out of sight into a nearby apartment building.

[¶4] Two officers gave chase, and upon entering the apartment building the officers heard someone upstairs say something to the effect of "[w]ho are you, I don't know you . . . [g]et out of my apartment . . . I'm not letting you in." The police then encountered Mahmoud descending the stairs. Notably, Mahmoud was no longer wearing an orange hat and had some facial hair—an attribute that the victim and the bystander had not mentioned in describing the assailant. Mahmoud did, however, match the description in all other respects, and both police officers later identified Mahmoud as the same person that had run away from them into the apartment building. Mahmoud was arrested, and while being taken into custody spontaneously said to the officers, "I didn't punch him."

[¶5] The officers escorted Mahmoud out of the apartment building to a police cruiser that was parked near the victim and his friend. As officers approached the cruiser with Mahmoud in custody, the victim and his friend each identified Mahmoud as the assailant. At trial the victim's friend testified that she identified Mahmoud after being asked by a police officer whether he was the assailant, but an officer testified to the contrary, saying, "I did not ask

[the victim or his friend] if that was the subject. They both without being asked identified [Mahmoud] as the subject." No identification procedures, such as a lineup, were conducted after the positive identifications that night.

## II. PROCEDURAL HISTORY

[¶6] In August 2014, Mahmoud was charged by complaint with one count of refusing to submit to arrest (Class D), 17-A M.R.S. § 751-B(1)(B) (2015), and one count of assault (Class D), 17-A M.R.S. § 207(1)(A). The court held a jury trial on February 17–18, 2015. At no point either before or during the trial did Mahmoud seek to exclude his identification by any of the witnesses.

[¶7] At trial, Mahmoud's proposed jury instructions included, "You may consider the following in evaluating the accuracy of an eyewitness identification: risks of cross-racial identification, risks of identification under stress, at best, weak correlation between the witness's confidence and accuracy of the identification, [and] the influence of any suggestive identification circumstances."

[¶8] The State opposed Mahmoud's proposed instructions, contending that jury instructions on eyewitness identification are improper as a matter of law based on *State v. Lavoie*, 561 A.2d 1021 (Me. 1989), discussed *infra*,

among other precedents. The court rejected the State's argument, reasoning that courts "generally seem to be evolving toward at least telling jurors they ought to consider carefully eye witness testimony and [listing] some of the factors that they might want to consider." Although the court agreed to give an instruction on eyewitness identification, the court did not give Mahmoud's proposed instructions verbatim, stating,

> [B]ut I'm not going to go as far as the [proposed] instruction for some of the reasons mentioned in Justice Alexander's commentary [*see* Alexander, *Maine Jury Instruction Manual* § 6-22A at 6-38–6-42 (2016 ed.)] and for some other reasons, which is I don't think I should be mentioning to a jury . . . studies that are not before the jury and are not subject to cross-examination and that I actually haven't conducted and can't vouch for their accuracy. I don't think I should be announcing as a matter of judicial notice that . . . certain sociolog[ical] studies are correct or are worth considering.

[¶9] The court gave the following jury instruction, in pertinent part:

> [Y]ou should carefully consider any testimony relating to eye witness identification. For instance, you should consider the following in determining the accuracy of any eye witness identification[:] whether the accuracy of an eye witness identification may be affected by the fact that the person identified is of a different race, which may make it more difficult to identify an individual, whether the accuracy of an eye witness identification may be affected by the circumstances under which it was made, how much weight, if any, you should give to the amount of certainty expressed by a witness given that there may not be a correlation between the reliability of an eye witness

identification and the amount of certainty expressed by the witness in making that identification. It's up to you to consider those issues and evaluate whether those affect any eye witness identification.

The jury found Mahmoud not guilty of refusing to submit to arrest, but delivered a verdict of guilty on the charge of assault. The court sentenced Mahmoud to ninety days' imprisonment, with all but twenty days suspended, followed by one year of administrative release and a $300 fine. This appeal followed.

## III. DISCUSSION

[¶10] "We review jury instructions as a whole for prejudicial error, and to ensure that they informed the jury correctly and fairly in all necessary respects of the governing law." *State v. Tucker*, 2015 ME 68, ¶ 11, 117 A.3d 595 (quotation marks omitted). "We will vacate a judgment based on a denied request for a jury instruction if the appellant demonstrates that the requested instruction (1) stated the law correctly; (2) was generated by the evidence; (3) was not misleading or confusing;[1] and (4) was not sufficiently covered in the instructions the court gave." *State v. Hanaman*, 2012 ME 40, ¶ 16, 38 A.3d 1278. Additionally, a "court's refusal to give the requested instruction must have been prejudicial to the requesting party." *Id.*

---

[1] The State concedes that the requested jury instruction was not misleading or confusing, and we do not discuss this issue further.

A.    Whether the Requested Instruction Stated the Law Correctly

[¶11]   Pursuant to the first prong of the *Hanaman* analysis, the first question is whether Mahmoud's proposed jury instructions stated the law correctly.  *Id*.  The State contends that Mahmoud's proposed instructions stated the law incorrectly because, inter alia, jury instructions on eyewitness identifications would amount to a departure from precedent.

[¶12]   We last considered the propriety of jury instructions on eyewitness identification in *State v. Lavoie*, 561 A.2d 1021 (Me. 1989).  In *Lavoie*, we concluded that jury instructions regarding eyewitness identification are improper as a matter of law because they have the effect of "singl[ing] out the testimony of an eyewitness for special scrutiny."  *Id.* at 1023; *see State v. McDonough*, 507 A.2d 573, 575-76 (Me. 1986) (concluding that the trial court properly rejected the defendant's proposed jury instruction because it singled out testimony for "special scrutiny").

[¶13]   Over the course of the nearly thirty years since our holding in *Lavoie*, a significant body of scientific research has emerged concerning the mechanics of human memory and the reliability of eyewitness identifications generally.[2]  These extensive scientific studies have provided new insights into

---

[2]  Courts across the country have recently acknowledged and relied on the tremendous growth in the body of scientific research in this area.  *See, e.g.*, *State v. Lawson*, 291 P.3d 673, 685 (Or. 2012)

8

the fallibility of eyewitness identifications, and as a result many state and

federal courts now instruct jurors accordingly.[3]  In light of these scientific

("Since 1979 . . . there have been more than 2,000 scientific studies conducted on the reliability of eyewitness identification."); *State v. Cabagbag*, 277 P.3d 1027, 1035 (Haw. 2012) ("Since the first cases addressing the reliability of eyewitness testimony were decided in the 1970s, a robust body of research in the area of eyewitness identification has emerged."); *State v. Henderson*, 27 A.3d 872, 877 (N.J. 2011) ("In the thirty-four years since the United States Supreme Court announced a test for the admission of eyewitness identification evidence . . . a vast body of scientific research about human memory has emerged.  That body of work casts doubt on some commonly held views relating to memory."); *see also State v. Guilbert*, 49 A.3d 705, 720 & n.9 (Conn. 2012) (collecting studies reflecting "a near perfect scientific consensus" that eyewitness identifications are potentially unreliable); Mass. Supreme Judicial Court Study Grp. on Eyewitness Evidence, Report and Recommendations to the Justices (2013) (Study Group Report), [https://perma.cc/WY4M-YNZN].

[3]  In *Perry v. New Hampshire*, 565 U.S. 228 (2012), the United States Supreme Court cited numerous examples of jury instructions on eyewitness testimony adopted by state and federal courts:

> *See* Model Crim. Jury Instr. No. 4.15 (CA3 2009); *United States v. Holley*, 502 F.2d 273, 277-278 (CA4 1974); Pattern Crim. Jury Instr. No. 1.29 (CA5 2001); Pattern Crim. Jury Instr. No. 7.11 (CA6 2011); Fed. Crim. Jury Instr. No. 3.08 (CA7 1999); Model Crim. Jury Instr. for the District Courts No. 4.08 (CA8 2011); Model Crim. Jury Instr. No. 4.11 (CA9 2010); Crim. Pattern Jury Instr. No. 1.29 (CA10 2011); Pattern Jury Instr. (Crim. Cases) Spec. Instr. No. 3 (CA11 2010); Rev. Ariz. Jury Instr., Crim., No. 39 (3d ed. 2008); 1 Judicial Council of Cal. Crim. Jury Instr. No. 315 (Summer 2011); Conn. Crim. Jury Instr. 2.6-4 (2007); 2 Ga. Suggested Pattern Jury Instr. (Crim. Cases) No. 1.35.10 (4th ed. 2011); Ill. Pattern Jury Instr., Crim., No. 3.15 (Supp. 2011); Pattern Instr., Kan. 3d, Crim., No. 52.20 (2011); 1 Md. Crim. Jury Instr. & Commentary §§ 2.56, 2.57(A), 2.57(B) (3d ed. 2009 and Supp. 2010); Mass. Crim. Model Jury Instr. No. 9.160 (2009); 10 Minn. Jury Instr. Guides, Crim., No. 3.19 (Supp. 2006); N. H. Crim. Jury Instr. No. 3.06 (1985); N. Y. Crim. Jury Instr. "Identification--One Witness" and "Identification--Witness Plus" (2d ed. 2011); Okla. Uniform Jury Instr., Crim., No. 9-19 (Supp. 2000); 1 Pa. Suggested Standard Crim. Jury Instr. No. 4.07B (2d ed. 2010); Tenn. Pattern Jury Instr., Crim., No. 42.05 (15th ed. 2011); Utah Model Jury Instr. CR404 (2d ed. 2010); Model Instructions from the Vt. Crim. Jury Instr. Comm. Nos. CR5-601, CR5-605 (2003); W. Va. Crim. Jury Instr. No. 5.05 (6th ed. 2003).

*Id.* at 246 n.7.  The widespread judicial endorsement of jury instructions on eyewitness reliability reflects the improved scientific understanding in this field.  *See, e.g.*, *Commonwealth v. Gomes*, 22 N.E.3d 897, 900 (Mass. 2015) ("[W]e conclude that there are scientific principles regarding eyewitness identification that are 'so generally accepted' that it is appropriate in the future to instruct juries regarding these principles so that they may apply the principles in their evaluation of eyewitness identification evidence."), *abrogated by Commonwealth v. Bastaldo*, 32 N.E.3d 873

studies, some courts have expressed a preference for jury instructions rather than expert testimony addressing the eyewitness identification issue. For example, in *United States v. Jones*, the First Circuit concluded that "[t]he judge was fully entitled to conclude that this general information [pertaining to eyewitness reliability] could be more reliably and efficiently conveyed by instructions rather than through dueling experts." 689 F.3d 12, 20 (1st Cir. 2012).

[¶14] The New Jersey Supreme Court and the Massachusetts Supreme Judicial Court, among others, have conducted comprehensive analyses of the science relating to eyewitness reliability.[4] Embedded in this research

---

(Mass. 2015) (building on *Gomes* by specifying when evidence warrants a cross-racial identification instruction); *Cabagbag*, 277 P.3d at 1038 ("[T]he impetus for a change in our approach lies in the empirical research that reveals that people generally do not understand all of the factors that affect the reliability of an eyewitness identification."); *Henderson*, 27 A.3d at 878, 910 (concluding that the then-current "standard for assessing eyewitness identification evidence . . . overstate[d] the jury's inherent ability to evaluate evidence offered by eyewitnesses who honestly believe their testimony is accurate," and stating that studies demonstrate that "laypersons are largely unfamiliar with scientific findings and often hold beliefs to the contrary" (quotation marks omitted)). The use of these instructions is consistent with the Supreme Court's recent endorsement of such instructions. *See Perry*, 565 U.S. at 233 ("When no improper law enforcement activity is involved, we hold, it suffices to test reliability through . . . jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.").

[4] In 2009, the New Jersey Supreme Court appointed a Special Master to evaluate and analyze the scientific evidence relating to eyewitness identifications. *Henderson*, 27 A.3d at 877, 884. After scrutinizing the testimony of seven experts resulting in over 2,000 pages of transcripts, and reviewing hundreds of scientific studies, the Special Master concluded that "[t]he science abundantly demonstrates the many vagaries of memory encoding, storage, and retrieval; the malleability of memory; the contaminating effects of extrinsic information; the influence of police interview techniques and identification procedures; and the many other factors that bear on the reliability of eyewitness identifications." *Id.* at 877, 916 (alteration in original) (quotation marks omitted). The research presented to the Special Master in *Henderson* included "more than

concerning eyewitness reliability is the generally accepted notion that a witness may have increased difficulty identifying persons of another race.[5] In light of the voluminous body of scientific research that has emerged regarding the reliability of eyewitness identification, and the subsequent evolving trend among both state and federal courts to instruct juries on this matter, we

twenty-five meta-analyses," *id.* at 893, and was described as "represent[ing] the gold standard in terms of the applicability of social science research to the law," *id.* at 916 (quotation marks omitted). The New Jersey Supreme Court detailed the findings of the Special Master, including a thorough discussion of the mechanics of human memory and how a host of system and estimator variables can adversely affect memory. *Id.* at 892-912. As a result of the Special Master's findings, the court revised its framework for evaluating eyewitness testimony by instructing courts to "develop and use enhanced jury charges." *Id.* at 919.

In 2011, the Massachusetts Supreme Judicial Court convened the Supreme Judicial Court Study Group on Eyewitness Evidence (the Study Group). *See Gomes*, 22 N.E.3d at 900 & n.3; *Commonwealth v. Walker*, 953 N.E.2d 195, 208 n.16 (Mass. 2011). The Study Group was tasked with determining "whether existing model jury instructions provide adequate guidance to juries in evaluating eyewitness testimony." *See Walker*, 953 N.E.2d at 208 n.16. In assessing the state of the science, the Study Group relied in part on the Report of the Special Master to the New Jersey Supreme Court in *Henderson*, *see* Study Group Report at 15 n.17, and additionally conducted its own extensive survey of the available scientific research, *see* Study Group Report at 15-32. In 2013, the Study Group issued a Report and Recommendation concluding that the Massachusetts jury instructions on eyewitness identification were inadequate, among other model jury instructions that were also based on the model jury instructions set forth in *United States v. Telfaire*, 469 F.2d 552, 558-59 (D.C. Cir. 1972). *See* Study Group Report at 3-4 & n.4, 51-58, 117-146.

[5] We have not previously addressed the issue of cross-racial identification. *See State v. Kelly*, 2000 ME 107, ¶ 16, 752 A.2d 188. The current state of the science strongly suggests that cross-racial identifications tend to be less accurate than same-race identifications. *See, e.g.*, *Bastaldo*, 32 N.E.3d at 880-81 ("The existence of the 'cross-race effect' (CRE)—that people are generally less accurate at identifying members of other races than they are at identifying members of their own race—has reached a near consensus in the relevant scientific community and has been recognized by courts and scholars alike. We remain convinced that jurors who are asked to evaluate the accuracy of an identification should be informed of the CRE." (footnotes omitted)); *Lawson*, 291 P.3d at 703 ("Studies also indicate that witnesses are significantly better at identifying members of their own race than those of other races."); *Henderson*, 27 A.3d at 907 ("A meta-analysis . . . involving thirty-nine studies and nearly 5,000 identifications[] confirmed the [New Jersey Supreme] Court's prior finding" that a witness may have more difficulty identifying members of another race).

conclude that it is permissible, where relevant, to instruct jurors on the reliability of eyewitness identification.[6] We do not, however, conclude that the use of an eyewitness identification instruction is *required* in every case involving an eyewitness identification. For example, the eyewitness identification instruction would not ordinarily be generated in instances when the identified person is already known to the witness.

[¶15] Prior to our decision today, the jury instructions in this case, both as proposed and as given, did not reflect our previous jurisprudence. However, as the trial court explicitly reasoned, the instructions were consistent with the evolution of the law regarding eyewitness identification. Thus, contrary to the State's contention, the jury instructions that the court gave are a correct statement of the law as we confirm it today.

B.     Whether the Requested Instruction Was Generated by the Evidence

[¶16] Having concluded that jury instructions on eyewitness reliability are permissible, we next decide whether the requested instruction was generated by the evidence in this case. *Hanaman*, 2012 ME 40, ¶ 16, 38 A.3d 1278. Mahmoud sought an instruction on four distinct issues relating to eyewitness reliability: (1) suggestive identification circumstances;

---

[6] To the extent that our decision today is in conflict with our previous precedents, this decision overrules them.

(2) cross-racial identification; (3) the stress experienced by the person making the identification; and (4) the uncertain relationship between witness confidence and accuracy. The State concedes on appeal that the evidence generated three of the issues, contesting only whether the evidence presented at trial provided a basis for an instruction as to suggestive identification circumstances, which the court declined to give.

[¶17] Mahmoud contends that an instruction was warranted because he was "paraded" before the victim and the victim's friend and was the only suspect shown to them. We note that there was no challenge pursuant to *Stovall v. Denno*, 388 U.S. 293 (1967), or its progeny[7] seeking to exclude identification evidence at trial, and therefore the scope of our review is limited to whether a jury instruction on suggestive identification procedures was raised by the evidence here.

---

[7] In *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967), the Court held that a defendant may claim that "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." *See Neil v. Biggers*, 409 U.S. 188, 196 (1972); *Coleman v. Alabama*, 399 U.S. 1, 4 (1970); *Foster v. California*, 394 U.S. 440, 442 (1969); *Simmons v. United States*, 390 U.S. 377, 383 (1968). The determination of whether an identification was "unnecessarily suggestive," the Court explained, is based on a totality of the circumstances, *Stovall*, 388 U.S. at 302, and among the factors to be considered are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation," *Biggers*, 409 U.S. at 199-200.

[¶18] Contrary to Mahmoud's contention, the evidence presented at trial did not generate an instruction as to suggestive identification circumstances. Mahmoud was first identified to the police by the victim shortly after the police arrived at the scene and before Mahmoud fled into a nearby apartment building. Although there is no dispute that Mahmoud was brought near the victim and his friend as officers were escorting him to the police cruiser, there is no evidence that the officers conducted a show-up procedure. The only evidence in the record potentially establishing a suggestive identification practice was a statement by the victim's friend that the police had asked her to identify the assailant. The friend's testimony, however, conflicted with the officer's earlier testimony that he had not asked any witness to identify the suspect. Despite the conflicting testimony, there was no follow-up questioning or cross-examination relating to the identification procedure. Additionally, Mahmoud concedes that he did not attempt to exclude the identifications at any point before or during trial.[8] In

---

[8] Even if such a challenge had been made, it is unlikely that the identification would have been excluded because the accuracy of the identification is supported by indicia of reliability. *See Biggers*, 409 U.S. at 199-200. The victim had ample time to observe Mahmoud because Mahmoud acted as a translator between the victim and the car owner for more than five minutes. After the opportunity to observe his assailant, the victim offered a description of Mahmoud that was corroborated by his friend's 9-1-1 call offering the same description, which was further corroborated by the bystander's description of Mahmoud to another officer. The victim also identified Mahmoud prior to any alleged suggestive circumstances, and two officers testified that the man apprehended inside the building—that is, Mahmoud—was the same man the victim

14

this light, we conclude that the evidence did not generate an instruction on suggestive identification circumstances. *See supra* n.8.

C.  Whether the Requested Instruction Was Sufficiently Covered by the Instructions Given

[¶19]  We turn next to the fourth prong of the *Hanaman* analysis, which is whether the jury instructions sought were sufficiently covered by the instructions actually given. *Hanaman*, 2012 ME 40, ¶ 16, 38 A.3d 1278. Mahmoud sought an instruction on four distinct factors relating to eyewitness identification: (1) suggestive identification circumstances; (2) cross-racial identification; (3) stress; and (4) the uncertain relationship between witness confidence and accuracy.  Mahmoud does not challenge the sufficiency of the cross-racial identification instruction, and we have concluded that an instruction concerning suggestive identification circumstances was not generated by the evidence.  We now address the two remaining factors in turn.

[¶20]  Mahmoud's requested instructions concerning the effects of stress on the person making the identification and the minimal correlation between that person's confidence in making the identification and its actual

identified before the apprehension.  Finally, the victim again identified his assailant immediately after his apprehension, which took place very shortly after the initial attack.

accuracy were covered by the court's instructions as given. With regard to stress, Mahmoud proposed the following instruction: "You may consider the following in evaluating the accuracy of an eyewitness identification . . . risks of identification under stress." The instruction that the court gave stated that "you should consider the following in determining the accuracy of any eye witness identification . . . whether the accuracy of an eye witness identification may be affected by the circumstances under which it was made." Although the court's instruction did not use the word "stress," its broad statement that "an eye witness identification may be affected by the circumstances under which it was made" encapsulates the concept of stress, among myriad other factors. At trial, the jury heard extensive testimony about the significant injury to the victim's eye shortly before he identified Mahmoud, and photos were published to the jury depicting the injury. Thus, the court's more generalized instruction covered the concept of stress, and the jury could have readily deduced that stress was among the factors potentially influencing a witness's identification of Mahmoud.

[¶21] With regard to accuracy, Mahmoud's proposed instruction stated that "[y]ou may consider the following in evaluating the accuracy of an eyewitness identification . . . at best, weak correlation between the witness's

confidence and accuracy of the identification." The instruction that the court gave stated that

> you should consider the following in determining the accuracy of any eye witness identification . . . how much weight, if any, you should give to the amount of certainty expressed by a witness given that there may not be a correlation between the reliability of an eye witness identification and the amount of certainty expressed by the witness in making that identification.

[¶22]  The court's instruction sufficiently covered the proposed instruction because, unlike Mahmoud's proposed "at best, weak correlation" language, the court's instruction suggested that there could be no correlation at all.  Because the jury was presented with the possibility that there may be no correlation between confidence and accuracy, the court's instruction sufficiently covered Mahmoud's proposed instruction.

The entry is:

Judgment affirmed.

**On the briefs:**

Jamesa J. Drake, Esq., Drake Law, LLC, Auburn, for appellant Ali M. Mahmoud

Lisa Bogue, Asst. Dist. Atty., and Michael Dumas, Stud. Atty., Prosecutorial District III, Auburn, for appellee State of Maine

**At oral argument:**

Jamesa J. Drake, Esq., for appellant Ali M. Mahmoud

Michael Dumas, Stud. Atty., for appellee State of Maine

Androscoggin County Superior Court docket number CR-2014-858
FOR CLERK REFERENCE ONLY