[Cite as *State v. Pettiford*, 2019-Ohio-892.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 27490 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-2713 |
| | : | |
| STEPHEN M. PETTIFORD | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 15th day of March, 2019.

. . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellant

MICHAEL T. GMOSER, Atty. Reg. No. 0002132 and LINA N. ALKAMHAWI, Atty. Reg. No. 0075462, 315 High Street, 11th Floor, Hamilton, Ohio 45011
        Attorneys for Amicus Curiae, Butler County Prosecutor's Office

SARAH C. LARCADE, Atty. Reg. No. 0095905 and ELIZABETH A. WELL, Atty. Reg. No. 0087750, 3976 North Hampton Drive, Powell, Ohio 43065
Attorneys for Amicus Curiae, Ohio Crime Victim Justice Center

MARCY A. VONDERWELL, Atty. Reg. No. 0078311, P.O. Box 24805, Dayton, Ohio 45424
        Attorney for Defendant-Appellee

JOHN K. CARROLL, Atty. Reg. No. 0002288, 4 Times Square, Suite 39-336, New York, New York 10036
        Attorney for Amicus Curiae, The Innocence Project, Inc.

ALEXIS AGATHOCLEOUS, Atty. Reg. No. 0002298, 40 Worth Street, Suite 701, New York, New York 10013
        Attorney for Amicus Curiae, The Innocence Network, The Innocence Project, Inc., and The Ohio Innocence Project

ELIZABETH BERRY, Atty. Reg. No. 0095524, 1255 New Hampshire Avenue, Apt. 832, Washington, D.C. 20036
        Attorney for Amicus Curiae, The Innocence Network

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Following Stephen Pettiford's acquittal on a single count of importuning, the State of Ohio filed a motion seeking leave to appeal under R.C. 2945.67(A) and App.R. 5(C). We granted the State's motion, and the State then filed a brief raising one assignment of error directed to instructions the trial court gave to the jury. Specifically, the State contends that the court abused its discretion by instructing the jury on the "fallacies" of memory. According to the State, the instructions were improperly based on the court's opinion, rather than the law.

{¶ 2} During the appeal, we granted leave to various amicus curiae, including the Butler County, Ohio, Prosecutor's Office, the Ohio Crime Victim Justice Center ("Victim Justice Center"), and the Innocence Project, all of whom assisted our understanding of the issues before us. We have carefully considered the arguments presented by all participants in the appeal.

{¶ 3} After considering the record and applicable law, we conclude that the trial court's jury instructions on fallacies of memory were based on legal authority supporting

the instructions, rather than the court's opinion. However, the trial court erred when it instructed the jury on memory science studies. Neither side presented expert testimony, nor did the court call an expert witness using appropriate procedures under Evid.R. 614. At this stage of legal development in Ohio, the science of witness memory relating to identification is the proper subject of expert testimony rather than the use of these disputed jury instructions. Furthermore, this case does not involve identification, as the defendant and alleged victim were acquainted with each other. Accordingly, the State's sole assignment of error will be sustained. Due to Pettiford's acquittal, however, trial court's judgment will not be disturbed, because Pettiford cannot be placed twice in jeopardy.

{¶ 4} For the foregoing reasons, we also find that unless the Ohio Supreme Court rules otherwise, information concerning memory and identification can be presented by expert testimony subject to the adversarial process, but that if so presented, a preliminary or final jury instruction that appears to support or not support such testimony is inappropriate.

{¶ 5} We also conclude that a concise, limited, and neutral memory or identification instruction which accords with controlling precedent may be appropriate; whether such instruction may require pre-trial expert evidence, subject again to the adversarial process, would depend on the precise wording of the instruction.

{¶ 6} Finally, we find that the instructions given in this case did not comply with our conclusions herein.[1]

---

[1] This opinion is one of three that will be released simultaneously dealing with the trial court's use of an instruction concerning the fallibility of human memory. *See State v. Rac*, 2d Dist., Montgomery No. 27536 and *State v. Mabberly*, 2d Dist. Montgomery No.

## I. Facts and Course of Proceedings

**{¶ 7}** This action arose from events that occurred in June 2016, during which Pettiford allegedly approached C.F., a 12-year old girl, and offered to give her money to engage in sexual conduct. Pettiford was 23 years old at the time.

**{¶ 8}** In September 2016, an indictment was filed, charging Pettiford with recklessly soliciting a person who was less than 13 years old to engage in sexual activity in violation of R.C. 2907.07(A), a third-degree felony. After Pettiford pled not guilty to the charge, a jury trial was held in February 2017, during which the State presented testimony from the following individuals: C.F., the alleged victim; C.F.'s grandmother; C.F.'s uncle; and an investigating police officer. The defense presented testimony from Pettiford, who denied the alleged conduct, and from two other witnesses. After hearing the evidence, the jury found Pettiford not guilty of the charge, and the trial court discharged him. The State then filed a timely motion for leave to appeal in order to challenge the trial court's jury instructions.

## II. Alleged Abuse of Discretion in Instructing the Jury

**{¶ 9}** The State's sole assignment of error is as follows:

> The Trial Court Abused Its Discretion by Giving Jury Instructions
> Regarding the Fallacies of Memory that Represented Opinion Rather than
> Law.

---

27729. Each opinion confronts a slightly different instruction delivered in the context of somewhat different records. Each opinion, nonetheless, reaches the conclusion that the trial court erred by giving the instruction, though based on different reasoning.

{¶ 10} Under this assignment of error, the State contends that the trial court's instructions were not supported by the law and also improperly represented a one-sided opinion about the fallacy of memory without mentioning factors that support the reliability of memory. Before addressing these points, we will briefly discuss the applicable legal standards.

## A. Appeal Under R.C. 2945.67

{¶ 11} As noted above, we granted the State leave to appeal under R.C. 2945.67(A), which gives us discretionary authority to hear appeals from decisions that are adverse to the State, other than final judgments. *State v. Bistricky*, 51 Ohio St. 3d 157, 555 N.E.2d 644 (1990), syllabus. Even though no current case in controversy exists due to double jeopardy principles, appellate review is nonetheless allowed where "the underlying legal question is capable of repetition yet evading review." *Id.* at 158, citing *Storer v. Brown*, 415 U.S. 724, 737, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), fn. 8. (Other citation omitted.) This point is particularly apt here, because the trial judge has specifically said that he will continue to instruct juries in every case as he has here. Transcript of Proceedings ("Tr.") p. 267.

{¶ 12} Courts have refused to allow appeal of jury instructions where the error would be limited to the facts within a particular case, or where the State does not claim that the instruction is an incorrect statement of law. *See, e.g., State v. Gott*, 6th Dist. Lucas No. L-11-1086, 2011-Ohio-3608, ¶ 15. However, that is not the situation here, as the State contends that the trial court's instruction incorrectly stated the law. Accordingly, we will consider the State's argument.

B.   Applicable Law Concerning Jury Instructions

{¶ 13} In the context of jury instructions, trial courts have certain duties under Crim.R. 30.   In the case before us, the trial court included instructions on memory during preliminary instructions and in the final charge to the jury.   Regarding preliminary instructions, Crim.R. 30(B) provides that:

> At the commencement and during the course of the trial, the court may give the jury cautionary and other instructions of law relating to trial procedure, credibility and weight of the evidence, and the duty and function of the jury and may acquaint the jury generally with the nature of the case.

{¶ 14} The Supreme Court of Ohio has stressed that "Crim.R. 30(B) plays an important part in the trial process.   Preliminary instructions prepare the jury for trial providing orientation so the jury is properly informed as to its duties and responsibilities." *State v. Comen*, 50 Ohio St.3d 206, 209, 553 N.E.2d 640 (1990).

{¶ 15} Because the trial court's actions under this part of the rule are discretionary, we will not disturb the court's actions absent an abuse of discretion.   *State v. Valentine*, 2d Dist. Montgomery No. 13192, 1992 WL 137101, *3 (June 19, 1992), citing *State v. Frost*, 14 Ohio App.3d 320, 322, 471 N.E.2d 171 (11th Dist.1984).   An abuse of discretion signifies a trial court attitude that is arbitrary, unconscionable, or unreasonable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).   Nonetheless, "most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary."   *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553

N.E.2d 597 (1990). Decisions are unreasonable if they are unsupported by a sound reasoning process. "It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*

{¶ 16} The duties under Crim.R. 30(A) are slightly different, as this part of the rule imposes a mandatory duty on the court. *Comen* at 209. Thus, after arguments have been completed, the court must "fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *Id.* at 210.

## C. Preliminary Instructions Given Under Crim.R. 30(B)

{¶ 17} In the case before us, the trial court gave the jury preliminary instructions about memory. *See* Tr. at pp.123-126. The court had drafted these instructions in conjunction with Dr. Craig Stark, a neuropsychologist who had trained Ohio Common Pleas Court Judges during a conference held in December 2016. Tr. at p. 268.

{¶ 18} The instructions on memory were given after the jury had been seated and before opening statements were made. *See* Tr. at pp.123-126. At that time, the court also gave the jury numerous other preliminary and cautionary instructions. *Id.* at pp. 114-128. However, as Pettiford notes, the State failed to object to the preliminary instructions and has waived any error about these instructions. *State v. Underwood*, 3 Ohio St.3d 12, 13, 444 N.E.2d 1332 (1983); *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 56. Since the State did object to a similar instruction at the close of evidence, we will focus our attention on that instruction.

C.   Instructions Given Under Crim.R. 30(A) at the Close of Evidence

**{¶ 19}** On appeal, the State contends that the trial court's instructions had no legal support and presented a one-sided opinion.   In addition, the State argues that the instructions were irrelevant, as witness identification was not an issue.   As support for giving the instructions, Pettiford and some of the amici curiae argue that other jurisdictions have established a scientific basis for such instructions.

**{¶ 20}** Before addressing these points, we note that this case involved only competing testimony of prosecution and defense witnesses, and no issues of identification.   No physical evidence existed; instead, the dispute was about statements one person allegedly made to the other.   There were also no direct witnesses, other than the alleged victim and the defendant.   During the State's case-in-chief, the State presented the testimony of the victim, C.F., who said that Pettiford had solicited her for oral sex on a particular date while they both were at church, and the testimony of the victim's grandmother, who both supported and contradicted the victim in certain respects.

**{¶ 21}** During the defense case, Pettiford denied that he was at church on the day in question, but also said that the incident had occurred a week earlier.   According to Pettiford, C.F. approached him at church and asked him to give her money in exchange for sexual contact.   Pettiford, who was acquainted with C.F.'s family, became angry and told C.F. that he was going to tell her family what she had said.   According to Pettiford, the incident was not reported to police until the following week.   Pettiford also presented a witness who offered some support for Pettiford's version of the incident.   And finally, the State presented rebuttal testimony from two witnesses (a police officer and the victim's

uncle), that was of little assistance.

{¶ 22} As was noted, Crim.R. 30(A) imposes a mandatory duty on the court after arguments are completed. At that time, the court must "fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *Comen*, 50 Ohio St.3d at 210, 553 N.E.2d 640.

{¶ 23} After the parties finished presenting evidence, the trial court held a conference to discuss the proposed jury charge. As part of the charge, the court included many of the same "memory" instructions that it had given as part of the preliminary instructions. This time, the State did object, contending that the charge was not a standard jury charge from Ohio Jury Instructions ("OJI"), and that the State could not find case law supporting the instruction. *See* Tr. at p. 266.

{¶ 24} At that point, the trial court agreed that the proposed "memory" charge was not in OJI and remarked that the court was "ahead of the curve on this one." *Id.* at p. 267. The court then made the following comments:

> All right. Let me state for the record that this instruction or something like it is going to be given by me in every single case going forward and that is because it is painfully obvious that the science behind the evaluation of human memory has long understood everything as set forth in that instruction that was talked about by [the prosecutor]. And that is that memory is imperfect. And how it works.
>
> People mistakenly think it works like a video camera. You can just call up memories and they're precise and they're accurate and that ain't [sic] true. And the evidence has established it's not true and everybody knows

it's not true. But we go through this I'll call it illusion when we try cases that memory is somehow imperfect – or perfect – or that people when they recall precise detail that they're more credible than people who don't. And the fact of the matter is it's just not true.

And we went through training – we, being the Common Pleas Judges of the State of Ohio – went through training in December at the winter meetings in which I believe his name is Craig Stark (phonetic) who is from U.C. – that's University of California – Santa Cruz and he's a human memory expert. I believe he's a neuropsychologist. And these instructions were developed by me in conjunction with him and his review of the proposed language that you see here.

And I also note that where you might find support for these instructions is in the Commonwealth of Massachusetts and the State of New Jersey which are both on the cutting edge of jury instructions in the work that they've done with psychologists about how human memory works.

So I note the State's objection. It's overruled. And the State's counsel can inform your colleagues that, at least in cases that get tried in my court, we're using that instruction.

Tr. at pp. 267-268.

{¶ 25} The court then instructed the jury as follows (while eliminating some parts of its preliminary instruction):

Importantly, imperfect memory is the norm. Memory is imperfect and susceptible to distortion and loss because human memory does not

work like a video camera accurately recording events we see and hear so that we may simply review and inspect them later. Rather, memory is an adaptive process based upon reconstruction itself based upon a witness' biases and experiences.

Memory is not infallible and should not be treated as such. For example, eyewitness testimony plays a role in roughly 75 percent of all cases in which individuals are wrongfully convicted as later proven conclusively by DNA evidence.

Errors in memory are driven by bias and experience because human brains are geared to look for regularities in the world. Indeed, people will actually remember nonexistent information based upon their expectations.

Eyewitnesses, jurors and judges are not immune to this reality. This is not abnormal. If we think an event should have happened in a certain way on the basis of our previous experiences, we are likely to think that the event did, indeed, happen in that fashion even when it did not.

We have known for decades that the passage of time between experiencing an event and later recalling it adversely affects accurate recall of the memory. This is because recent memories compete with older memories at the time of retrieval.

And simply retrieving a memory makes it subject to alteration or even elimination. For example, memory distortions may occur unconsciously merely with retelling.

Repeated questioning about an event can increase a witness'

confidence in the accuracy of their memory. Leading questions can increase the occurrence of false memories. Misleading questions can imply facts not actually presented into evidence by a witness.

Cross-racial bias adversely affects memory. A reduction in accuracy when identifying faces of a race or ethnic background different from one's own.

The general belief that confident detailed memories are always accurate and reliable is contrary to research suggesting that the opposite is possible, that confidently recalled memories can sometimes be inaccurate and that real memories are not always highly confident or detailed.

Often, peripheral details of an event such as clothing worn by a perpetrator are of low importance and not often recalled.

In weighing eyewitness testimony, jurors should determine whether it can be corroborated by other evidence. In sum, eyewitness memory should not be considered indelible even if the events were traumatic. Witness' biases and experiences will change over time, new information or misinformation can alter the memory. A witness' confidence and accuracy is no guarantee that the memory is, indeed, accurate because humans have a tendency to fill in gaps in any given memory.

Tr. at p. 274-276.

{¶ 26} While the trial court has a mandatory duty under Crim.R. 30(A) to give the jury all relevant and necessary instructions before argument, the court's decision on what jury instructions are given is still left to the court's sound discretion. *Comen*, 50 Ohio

St.3d at 209, 553 N.E.2d 640; *State v. Guster*, 66 Ohio St.2d 266, 271, 421 N.E.2d 157 (1981).

{¶ 27} Most appeals related to jury instructions center on a trial court's refusal to give a requested instruction or on challenges to choices among competing instructions. This case involves a somewhat unusual situation in which a trial court decided to tailor its own instructions.

{¶ 28} In *Guster,* the Supreme Court of Ohio noted that "a court's instructions to the jury should be addressed to the actual issues in the case as posited by the evidence and the pleadings. * * * Abstract rules of law or general propositions, even though correct, ought not to be given unless specifically applicable to facts in issue." *Guster* at 271.

{¶ 29} As noted, the State contends that the court's instructions were opinions and were also irrelevant because this case did not involve identification issues, which are addressed by the instructions. In addition, the Victim Justice Center contends that, because the jury instructions contained information outside the "presented evidence," the instructions were simply judicial testimony, which is prohibited under Evid.R. 605. According to the Victim Justice Center, the trial court also provided "expert testimony" in violation of Evid.R. 702.

{¶ 30} Taking the last two points first, Evid.R. 605 states that "[t]he judge presiding at the trial may not testify in that trial as a witness." The reason for preventing judges from testifying is "because it is unnecessary, prejudicial to one party, and could reflect adversely on the integrity or impartiality of the judiciary." *Hirschberger v. Silverman*, 80 Ohio App.3d 532, 540, 609 N.E.2d 1301 (6th Dist.1992). *See also State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 139. Evid.R. 702 further requires

that experts be qualified and that their testimony be "based on reliable scientific, technical, or other specialized information."  Evid.R. 702(B) and (C).

{¶ 31} In our opinion, the trial court did not "testify" in violation of these rules. While the court's methods were unorthodox, there was no indication that the court testified in the capacity of a witness or that the jury interpreted the court's actions as such.  Cases involving Evid.R. 605 typically involve attempts to obtain direct sworn testimony from a judge who has presided in a case.  *See, e.g., State v. Beitzel*, 5th Dist. Tuscarawas No. 93AP050036, 1994 WL 313737, *2 (June 14, 1994) (defendant was not allowed to call judge who had presided at preliminary hearing to testify as witness at trial).

{¶ 32} Furthermore, the trial court did advance a legal basis for its instructions, i.e., that other jurisdictions had considered scientific research on memory and had adopted similar instructions.  Tr. at p. 268.  As a result, the real issue is whether the court's legal basis was correct.  A corollary point is whether the legal basis should be adopted, even if it might be correct.


D.  Analysis of Legal Basis for the Court's Instructions

{¶ 33} In its discussion, the trial court generally referenced decisions in New Jersey and Massachusetts without citing specific cases.  The leading case in New Jersey is *State v. Henderson*, 208 N.J. 208, 27 A.3d 872 (2011).  In *Henderson*, the New Jersey Supreme Court considered evidence from a Special Master that it had appointed to evaluate scientific and other evidence pertaining to eyewitness identification.  The court adopted much of the Special Master's report, after the Master had "presided over a hearing that probed testimony by seven experts and produced more than 2,000 pages of

transcripts along with hundreds of scientific studies." *Id.* at 217-18. The parties and amici produced more than 360 exhibits, including "more than 200 published scientific studies on human memory and eyewitness identification." *Id.* at 229. In addition, seven expert witnesses testified, including three well-credentialed eyewitness identification experts, three law professors, and a county prosecutor who had also trained law enforcement personnel internationally and locally. *Id.* at 229-230.

{¶ 34} After finding the scientific evidence reliable, the New Jersey Supreme Court stated that it "was convinced from the scientific evidence in the record that memory is malleable, and that an array of variables can affect and dilute memory and lead to misidentification." *Id.* at 218.

{¶ 35} Some of the discussion in *Henderson* is irrelevant, as it focuses on eyewitness identification, which is not at issue here. Specifically, there was no dispute that the alleged victim and Pettiford were acquainted. However, the *Henderson* court did discuss scientific findings on memory that may be pertinent for our discussion.

{¶ 36} As background, the court in *Henderson* noted that the current framework for admissibility of eyewitness identification was derived from the 1977 opinion in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). *Henderson* at 237. Under *Manson*, a two-step analysis is used to decide admissibility. First, the court decides if an identification procedure was "impermissibly suggestive." If so, the court then decides "whether the objectionable procedure resulted in a 'very substantial likelihood of irreparable misidentification.' " *Id.* at 238, quoting *State v. Madison*, 109 N.J. 223, 232, 536 A.2d 254 (1988) (which had summarized the two-step procedure in *Manson*). Identification testimony can be admitted if it is reliable despite its

suggestiveness. *Id.* Ohio has adopted the same type of approach. *See, e.g., State v. Lott*, 51 Ohio St.3d 160, 175, 555 N.E.2d 293 (1990); *State v. Parker*, 53 Ohio St.3d 82, 87, 558 N.E.2d 1164 (1990); *State v. Bates*, 110 Ohio St.3d 1230, 2006-Ohio-3667, 850 N.E.2d 1208, ¶ 8-9.

{¶ 37} To assess reliability, both Ohio and New Jersey have traditionally used the following five "*Biggers*" factors, which were adopted in *Manson*: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson* at 114, citing *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). *Compare Bates* at ¶ 9.

{¶ 38} In *Henderson*, the New Jersey Supreme Court commented that:

Virtually all of the scientific evidence considered on remand emerged after *Manson*. In fact, the earliest study the State submitted is from 1981, and only a handful of the more than 200 scientific articles in the record pre-date 1970.

During the 1970s, when the Supreme Court decided *Manson*, researchers conducted some experiments on the malleability of human memory. But according to expert testimony, that decade produced only four published articles in psychology literature containing the words "eyewitness" and "identity" in their abstracts. By contrast, the Special Master estimated that more than two thousand studies related to eyewitness identification have been published in the past thirty years.

*Henderson* at 241-42.

**{¶ 39}** In a summary of its findings, the court concluded that

We are convinced from the scientific evidence in the record that memory is malleable, and that an array of variables can affect and dilute memory and lead to misidentifications. Those factors include system variables like lineup procedures, which are within the control of the criminal justice system, and estimator variables like lighting conditions or the presence of a weapon, over which the legal system has no control. * * *

In the end, we conclude that the current standard for assessing eyewitness identification evidence does not fully meet its goals. It does not offer an adequate measure for reliability or sufficiently deter inappropriate police conduct. It also overstates the jury's inherent ability to evaluate evidence offered by eyewitnesses who honestly believe their testimony is accurate.

*Id.* at 218.

**{¶ 40}** To address these concerns, the court noted two steps that should be taken: (1) trial courts should weigh both "system" and "estimator" variables to decide if evidence is admissible where suggestive procedures were used; and (2) (as pertinent here) "the court system should develop enhanced jury charges on eyewitness identification for trial judges to use." *Id.* at 219.

**{¶ 41}** System variables are matters within the State's control. They include the following matters:

- How lineup procedures are conducted.

- Pre-identification instructions to witnesses.

- Lineup construction.

- Avoiding confirmatory feedback and recording the confidence of a witness.

- Avoiding multiple viewings.

- Avoiding "showups."

*Id.* at 248-261.

{¶ 42} In contrast, estimator variables are factors the criminal justice system cannot avoid. These factors include the following items:

- Stress (which impairs ability to recall and make accurate identifications).

- Distraction caused by "weapon focus."

- The amount of time witnesses have to observe events.

- Distance and lighting conditions.

- Characteristics like witness age and level of intoxication.

- Disguises and changes in a perpetrator's facial features.

- The decay of memory after the lapse of time.

- Racial bias (witnesses have more difficulty in making cross-race identifications).

- The effect of private actors, like co-witnesses, who share information about what they observed or who can affect witness confidence.

- The speed with which a witness makes an identification.

*Id.* at 261-272.

{¶ 43} Again, *Henderson* involved eyewitness identification rather than the more general subject of witness testimony and memory, so some of the discussion is not

relevant here. The court did, however, discuss how memory works. In addition, observations scattered throughout the court's opinion are consistent with the jury instructions in the case below us. *See Henderson* at 218, 231, 236, 240, 244-248, 253-256, 267-270, 274, 285-285, and 299.

{¶ 44} After commenting on the arguments that the parties presented, the Supreme Court of New Jersey discussed the validity of the scientific evidence and concluded that it was both "both reliable and useful." *Id*. at 283. In this regard, the court commented that:

> The research presented on remand is not only extensive, but as Dr. Monahan [an expert] testified, it represents the "gold standard in terms of the applicability of social science research to the law." Experimental methods and findings have been tested and retested, subjected to scientific scrutiny through peer-reviewed journals, evaluated through the lens of meta-analyses, and replicated at times in real-world settings. As reflected above, consensus exists among the experts who testified on remand and within the broader research community.

*Id.*

{¶ 45} The Supreme Court of New Jersey then concluded that the *Manson* framework, which was premised on assumptions about reliability, was invalid because it failed to provide a sufficient measure for reliability, did not deter improper practices, and overstated a jury's "innate ability to evaluate eyewitness testimony." *Id.* at 285, discussing *Manson*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140.

{¶ 46} After discussing the reasons for these failures, the Supreme Court of New

Jersey adopted a revised system for suppression hearings, which was to be supplemented by appropriate jury instructions if the court decided not to suppress the evidence. *Id.* at 286-292. Essentially, trial courts would consider whether the defendant had presented some evidence of suggestiveness to trigger a pretrial hearing under *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (commonly referenced as a "*Wade* hearing"). Courts would consider this issue using the "system variables" mentioned above. *Henderson* at 288-289. If the court decided at any time that the "initial claim of suggestiveness [was] baseless," it could end the hearing. *Id.* at 290.

{¶ 47} However, if "some actual proof of suggestiveness" remained after the system variables had been reviewed, courts would consider both these variables and the "estimator variables" to "evaluate the overall reliability of an identification and determine its admissibility." *Id.* at 291. Significantly, the court stressed that the estimator variables were not exclusive, nor were they "frozen in time." Instead, they could change based on the dynamic nature of scientific research. *Id.* at 292. If the evidence were suppressed, the analysis ended there. If identification evidence were not suppressed, however, either experts or enhanced jury instructions should be used at trial. The court stressed that, most often, jury instructions would suffice. *Id.* at 298-299.

{¶ 48} Following this discussion, the New Jersey Supreme Court asked the Criminal Practice Committee and the Committee on Model Criminal Jury Charges to draft proposed revisions to the current jury charge and submit them to the court. *Id.* at 299. New model instructions were developed and went into effect in September 2012. *See*

*State v. Sanchez-Medina*, 231 N.J. 452, 466, 176 A.3d 788 (2018).[2]

### E. Comparison of Instructions to Legal Statements in *Henderson*

**{¶ 49}** As we mentioned, statements in *Henderson* are consistent with or similar to most of the statements in the trial court's jury instructions. The following discussion compares the trial court's instructions with the supporting statements in *Henderson*.

### 1. "Video Camera"

**{¶ 50}** Trial Court:

Importantly, imperfect memory is the norm. Memory is imperfect and susceptible to distortion and loss because human memory does not work like a video camera accurately recording events we see and hear so that we may simply review and inspect them later. Tr. at p. 274.

**{¶ 51}** *Henderson*:

"Research contained in the record has refuted the notion that memory is like a video recording, and that a witness need only replay the tape to remember what happened," and "the witness does not perceive all that a videotape would disclose * * *." *Henderson*, 208 N.J. 245 and 246, 27 A.3d 872.

### 2. Process of Memory

---

[2] The model instructions (Non 2C, Identification – In Court and Out of Court Identifications), can be found at: www.njcourts.gov/attorneys/criminalcharges.html (accessed March 11, 2019).

**{¶ 52}** Trial Court:

Rather, memory is an adaptive process based upon reconstruction itself based upon a witness' biases and experiences.   Tr. at p. 274.

**{¶ 53}** *Henderson*:

"We are convinced from the scientific evidence in the record that memory is malleable, and that an array of variables can affect and dilute memory and lead to misidentifications."   *Henderson* at 218.   "The process of remembering consists of three stages: acquisition—'the perception of the original event'; retention—'the period of time that passes between the event and the eventual recollection of a particular piece of information'; and retrieval—the 'stage during which a person recalls stored information.' * * * '[M]emory rapidly and continuously decays; retained memory can be unknowingly contaminated by post-event information * * *.' "   *Id.* at 245-246, citing Elizabeth F. Loftus, *Eyewitness Testimony* 21 (2d ed.1996).

### 3.   Wrongful Convictions

**{¶ 54}** Trial Court:

"Memory is not infallible and should not be treated as such.   For example, eyewitness testimony plays a role in roughly 75 percent of all cases in which individuals are wrongfully convicted as later proven conclusively by DNA evidence."   Tr. at p. 274.

**{¶ 55}** *Henderson*:

"Nationwide, 'more than seventy-five percent of convictions

overturned due to DNA evidence involved eyewitness misidentification.' "

*Henderson* at 231, quoting *State v. Romero*, 191 N.J. 59, 74, 922 A.2d 693

(2007). (Other citations omitted.)

4. Errors and Distortions in Memory

**{¶ 56}** Trial Court:

Errors in memory are driven by bias and experience because human brains are geared to look for regularities in the world. Indeed, people will actually remember nonexistent information based upon their expectations.

Eyewitnesses, jurors and judges are not immune to this reality. This is not abnormal. If we think an event should have happened in a certain way on the basis of our previous experiences, we are likely to think that the event did, indeed, happen in that fashion even when it did not." Tr. at p. 274-275.

**{¶ 57}** *Henderson*:

*Henderson* discusses scientific studies that indicate how memory can be "distorted, contaminated and even falsely imagined." *Henderson* at 245-247 (discussing, among other things, how memory can be influenced by how a witness is questioned). Additional support is found in *Henderson's* discussion of scientific studies showing how memory can be affected by statements of others and prior experience - in other words, crediting information imparted by others due to past experiences with other persons or sources. *Id.* at 268-269.

## 5.   Passage of Time

**{¶ 58}** Trial Court:

We have known for decades that the passage of time between experiencing an event and later recalling it adversely affects accurate recall of the memory.   This is because recent memories compete with older memories at the time of retrieval.   Tr. at p. 275.

**{¶ 59}** *Henderson*:

The above statements from the trial court are consistent with a statement in *Henderson* that cites a 1996 study.   This study noted that "[t]he process of remembering consists of three stages: acquisition-'the perception of the original event'; retention-'the period of time that passes between the event and the eventual recollection of a particular piece of information'; and retrieval-the 'stage during which a person recalls stored information.' "   *Henderson* at 245, quoting Elizabeth F. Loftus, *Eyewitness Testimony* 21 (2d ed.1996).   The court went on to note that memory can be distorted, contaminated and falsely imagined at each stage.   *Id.   See also id.* at 267 (discussing studies indicating how "the more time that passes, the greater the possibility that a witness' memory of a perpetrator will weaken").

## 6.   Unconscious Memory Distortions

**{¶ 60}** Trial Court:

And simply retrieving a memory makes it subject to alteration or even elimination.   For example, memory distortions may occur unconsciously merely with retelling.   Tr. at p. 275.

**{¶ 61}** *Henderson*:

The above statement is consistent with the following statements in *Henderson*:

> We presume that jurors are able to detect liars from truth tellers. But as scholars have cautioned, most eyewitnesses think they are telling the truth even when their testimony is inaccurate, and "[b]ecause the eyewitness is testifying honestly (i.e., sincerely), he or she will not display the demeanor of the dishonest or biased witness." *See* Jules Epstein, *The Great Engine that Couldn't: Science, Mistaken Identity, and the Limits of Cross-Examination*, 36 Stetson L.Rev. 727, 772 (2007). Instead, some mistaken eyewitnesses, at least by the time they testify at trial, exude supreme confidence in their identifications. *Henderson* at 236, 27 A.3d 872.

The court also noted in *Henderson* that "jurors do 'not evaluate eyewitness memory in a manner consistent with psychological theory and findings.' " *Id.* at 274, quoting Brian L. Cutler et al., *Juror Sensitivity to Eyewitness Identification Evidence*, 14 Law & Hum. Behav. 185, 190 (1990).

## 7. Witness Confidence

**{¶ 62}** Trial Court:

> Repeated questioning about an event can increase a witness' confidence in the accuracy of their memory. Leading questions can increase the occurrence of false memories. Misleading questions can imply facts not actually presented into evidence by a witness. Tr. at p. 275.

**{¶ 63}** *Henderson*:

"[T]his Court has already acknowledged that accuracy and confidence 'may not be related to one another at all.' " *Id.* at 236, quoting *Romero*, 191 N.J. at 75, 922 A.2d 693. *See also:* "confirmation can reduce doubt and engender a false sense of confidence in a witness. Feedback can also falsely enhance a witness' recollection of the quality of his or her view of an event." *Id.* at 253. "Private actors can also affect witness confidence." *Id.* at 270. In addition, *Henderson* discussed at length how witness memories can be distorted by the way in which questions are asked or by inclusion of information that is false. *Id.* at 246-247.

## 8. Cross-Racial Bias

**{¶ 64}** Trial Court:

Cross-racial bias adversely affects memory. A reduction in accuracy when identifying faces of a race or ethnic background different from one's own. Tr. at p. 275.

**{¶ 65}** *Henderson*:

" 'A cross-racial identification occurs when an eyewitness is asked to identify a person of another race.' " *Henderson* at 267, quoting *State v. Cromedy*, 158 N.J. 112, 120, 727 A.2d 457 (1999). *Henderson* noted that a meta-analysis done after *Cromedy* (involving 39 studies and over 5,000 identifications) had confirmed that witnesses may have more difficulty making cross-racial identifications and this can be factor in reliability. *Id.* Later, *Henderson* discussed various cases and scientific evidence involving cross-

racial identification. *Id.* at 284-285. Ultimately, the court required that its previously adopted cross-racial identification charge should be given "whenever cross-racial identification is in issue at trial." *Id.* at 299.[3]

### 9. Accuracy of Detailed Memories

**{¶ 66}** Trial Court:

The general belief that confident detailed memories are always accurate and reliable is contrary to research suggesting that the opposite is possible, that confidently recalled memories can sometimes be inaccurate and that real memories are not always highly confident or detailed. Tr. at p. 275-276.

**{¶ 67}** *Henderson*:

"[L]ab studies have shown that eyewitness confidence can be influenced by factors unrelated to a witness' actual memory of a relevant event" * * * [and] "accuracy and confidence 'may not be related to one another at all.' " *Henderson* at 236, quoting *Romero*, 191 N.J. at 75, 922 A.2d 693. Further, "jurors do 'not evaluate eyewitness memory in a manner consistent with psychological theory and findings.' " *Id.* at 274, quoting Cutler, *Juror Sensitivity to Eyewitness Identification Evidence*, 14 Law & Hum. Behav. at 190; *see also id.* at 236 and 253-256 (discussing the distinction between witness confidence and mistake in identification as well as factors that can

---

[3] The cross-racial charge is part of the New Jersey model identification charge referenced in footnote 1. In the case before us, the victim and Pettiford were of different races. *See* Tr. at p. 75. However, as we noted, identification was not a disputed issue at trial.

influence witness confidence unrelated to actual memory).

### 10. Peripheral Details

**{¶ 68}** Trial Court:

Often, peripheral details of an event such as clothing worn by a perpetrator are of low importance and not often recalled. Tr. at p. 276.

**{¶ 69}** *Henderson*:

*Henderson* did not specifically discuss clothing. However, it did discuss falsely imagined details, including experiments where researchers inserted false details that were insignificant into information or discussions about films or videos subjects had watched. This caused subjects to insert the false details into their memory of the incidents they had seen. *Henderson* at 247, 269-270.

### 11. Corroboration

**{¶ 70}** Trial Court:

In weighing eyewitness testimony, jurors should determine whether eyewitness testimony can be corroborated by other evidence. In sum, eyewitness memory should not be considered indelible even if the events were traumatic. Witness' biases and experiences will change over time, new information or misinformation can alter the memory. A witness' confidence and accuracy is no guarantee that the memory is, indeed, accurate because humans have a tendency to fill in gaps in any given memory. Tr. at p. 136.

**{¶ 71}** *Henderson*:

Comments in *Henderson* about confidence and misinformation have already been discussed. Concerning the trial court's instruction in the first sentence about weighing eyewitness testimony, *Henderson* talks about "corroboration" in the context of cross-racial identification, but not in terms of weighing evidence. *Henderson* at 299.

The second sentence concerning trauma is consistent with *Henderson's* observation that "studies have shown consistently that high degrees of stress actually impair the ability to remember." *Id.* at 244, citing Kenneth A. Deffenbacher et al., *A Meta–Analytic Review of the Effects of High Stress on Eyewitness Memory*, 28 Law & Hum. Behav. 687, 687, 699 (2004).

**{¶ 72}** Having connected almost all the trial court's instructions to specific legal statements in *Henderson*, we conclude that the trial court did not simply express its own opinions, but did have a legal basis for the instructions. Again, whether those instructions should be adopted is a different issue.

## F. Massachusetts Authority

**{¶ 73}** As we noted, the trial court also relied on unspecified Massachusetts authority. In *Commonwealth v. Gomes*, 470 Mass. 352, 22 N.E.3d 897 (2015), the Supreme Court of Massachusetts issued a provisional jury instruction regarding eyewitness identification evidence, and it invited comments before it declared it a model jury instruction. *Id.* at 354. The court noted that it had "the benefit of the Report and Recommendations of the Supreme Judicial Court Study Group on Eyewitness Evidence

(Study Group Report), and the comments in response to it." (Footnotes omitted.) *Id.*[4] Based on these studies and comments, the court concluded that "there are scientific principles regarding eyewitness identification that are 'so generally accepted' that it is appropriate in the future to instruct juries regarding these principles so that they may apply the principles in their evaluation of eyewitness identification evidence." *Id.*

{¶ 74} In *Gomes*, the court stated that "a principle is 'so generally accepted' that it is appropriate to include in a model eyewitness identification instruction where there is a near consensus in the relevant scientific community adopting that principle." *Gomes* at 366-367. The court then said that "[a]fter reviewing the scholarly research, analyses by other courts, amici submissions, and the Study Group Report and comments, we conclude that there are various principles regarding eyewitness identification for which there is a near consensus in the relevant scientific community." *Id.* at 367. As a result, the court decided to revise its previous model instruction to include five principles that were accepted concerning eyewitness identification. *Id.* at 369-375.[5]

{¶ 75} These principles included:

> i. Human memory does not function like a video recording but is a complex process that consists of three stages: acquisition, retention, and

---

[4] The Supreme Court of Massachusetts had previously recognized that while eyewitness identification is an invaluable law enforcement tool, it is also the " 'greatest source of wrongful conviction.' " *Gomes*, 470 Mass. at 360, 22 N.E.3d 897, quoting *Commonwealth v. Walker*, 460 Mass. 590, 604, 953 N.E.2d 195 (2011), fn. 16. As a result, the court had convened a study group to consider the issue.

[5] The model instructions were adopted in November 2015. *See Commonwealth v. Herndon*, 475 Mass. 324, 328, 56 N.E.3d 814 (2016), fn. 11. The instructions can be found at: www.mass.gov/files/documents/2016/08/wt/9160-defenses-identification.pdf (accessed on March 11, 2019).

retrieval.

* * *

ii. An eyewitness's expressed certainty in an identification, standing alone, may not indicate the accuracy of the identification, especially where the witness did not describe that level of certainty when the witness first made the identification

* * *

iii. High levels of stress can reduce an eyewitness's ability to make an accurate identification.

* * *

iv. Information that is unrelated to the initial viewing of the event, which an eyewitness receives before or after making an identification, can influence the witness's later recollection of the memory or of the identification.

* * *

v. A prior viewing of a suspect at an identification procedure may reduce the reliability of a subsequent identification procedure in which the same suspect is shown.

*Id.* at 369-375.

**{¶ 76}** The provisional instructions set forth in *Gomes* were less detailed than those of New Jersey, but the approaches of these jurisdictions are similar in terms of relying on accepted scientific principles related to memory and identification. [6]

---

[6] Massachusetts later modified its provisional jury instruction on cross-racial identification

Furthermore, Massachusetts has indicated that its final model instruction as adopted "is very similar to the model jury instruction in New Jersey." *Commonwealth v. McWilliams*, 473 Mass. 606, 619, 45 N.E.3d 94 (2016), fn. 5.

## G. Conflict Among Jurisdictions

**{¶ 77}** Notably, there are conflicts in the law about eyewitness identification. The case before also us does not specifically involve eyewitness identification; instead, the trial court's instructions simply were a general discussion of the ways in which memory can be fallible.

**{¶ 78}** The United States Supreme Court, itself, has said that "[w]e do not doubt either the importance or the fallibility of eyewitness identifications." *Perry v. New Hampshire*, 565 U.S. 228, 245, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012). Despite this, the court concluded that "fallibility of eyewitness identification does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id.* *Perry* involved the issue of whether the taint of private conduct should trigger such a due process rule, so it is not strictly pertinent. However, the court has recognized that eyewitness identification (and, therefore, memory) can be fallible.

**{¶ 79}** Some other jurisdictions have agreed with *Henderson*, 208 N.J. 208, 27

---

and provided guidance about when it should be given. (The new guidance was that it should always be given unless the parties agreed there was no cross-racial identification.) *Commonwealth v. Bastaldo*, 472 Mass. 16, 18, 32 N.E.3d 873 (2015). For the reasons already expressed, this type of instruction has little relevance to the case before us. We note that Idaho has rejected a cross-racial jury instruction proposed by the American Bar Association's Criminal Justice Section, at least based on the case before it. *State v. Doap Deng Chuol*, 2014 S.D. 33, 849 N.W.2d 255, ¶ 33.

A.3d 872, about the reliability of scientific evidence on the subject of eyewitness identification. For example, in *State v. Harris*, 330 Conn. 91, 191 A.3d 119 (2018), the Connecticut Supreme Court modified the *Biggers* framework to conform to recent developments in law and social science, endorsed reliability factors it had previously identified in *State v. Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012), and adopted *Henderson's* burden-shifting framework. *Id.* at 134.

{¶ 80} Other cases in agreement include: *State v. Lawson*, 352 Or. 724, 291 P.3d 673 (2012); *Minor v. United States*, 57 A.3d 406, 422, fn. 11 (D.C.2012); *State v. Almaraz*, 154 Idaho 584, 595, 301 P.3d 242 (2013) (agreeing with New Jersey Supreme Court and finding that "extensive research convincingly demonstrates the fallibility of eyewitness identification testimony and pinpoints an array of variables that are most likely to lead to a mistaken identification"); *Tillman v. State*, 354 S.W.3d 425, 441-443 (Tex.Crim.App.2011) (discussing *Henderson* and concluding that expert testimony on eyewitness identification is reliable); *People v. Lerma*, 2016 IL 118496, 47 N.E.3d 985, ¶ 24 (Ill.) (recognizing that eyewitness identification "research is well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony"); *Young v. State*, 374 P.3d 395, 417 (Alaska 2016) (following *Henderson* and *Lawson*, and replacing the *Biggers* factors with lists drawing on system and estimator variables).

{¶ 81} In *Commonwealth v. Walker*, 625 Pa. 450, 92 A.3d 766 (2014), the Pennsylvania Supreme Court reversed its prior ban on expert testimony on eyewitness identification. The court commented that "we embrace the extensive research and studies noted above (and the experience of all or nearly all federal circuits, 44 states, and the District of Columbia) only to the extent they serve as a foundation to highlight a

significant problem in our criminal justice system regarding eyewitness identification and to support modification of the current absolute ban [in Pennsylvania] of any expert testimony in this limited area." *Id.* at 494. *See also State v. Mahmoud*, 2016 ME 135, 147 A.3d 833, ¶ 14 (footnote omitted) ("In light of the voluminous body of scientific research that has emerged regarding the reliability of eyewitness identification, and the subsequent evolving trend among both state and federal courts to instruct juries on this matter, we conclude that it is permissible, where relevant, to instruct jurors on the reliability of eyewitness identification. We do not, however, conclude that the use of an eyewitness identification instruction is required in every case involving an eyewitness identification. For example, the eyewitness identification instruction would not ordinarily be generated in instances when the identified person is already known to the witness").

**{¶ 82}** Other courts disagree or have not yet directly considered the issue. *See, e.g., State v. Allen*, 176 Wash.2d 611, 624, 294 P.3d 679 (2013) (concluding that "a cautionary cross-racial identification instruction" would not have added to the safeguards operating in that particular case, which involved eyewitness identification based on general physique, apparel, and sunglasses, not on facial features); *Batiste v. State*, 121 So.3d 808, 855, fn. 7 (Miss.2013) (declining to adopt New Jersey's constitutional standards for evaluating admissibility of witness identification testimony); *Smiley v. State*, 442 Md. 168, 179, 111 A.3d 43 (2015) (declining to adopt theories and methodologies in *Henderson* for reviewing whether extrajudicial identifications are suggestive); *State v. Davis*, 131 A.3d 679, 696, fn. 13 (R.I.2016) (noting awareness of "growing concern in other jurisdictions with reliance on eyewitness identification testimony, the growing body of scientific and psychological studies regarding the questionable accuracy of the

accounts of eyewitnesses, and the efforts made to prevent a miscarriage of justice." However, the court did not decide this issue because it was not raised in the trial court).

{¶ 83} In *Corbin v. United States*, 120 A.3d 588 (D.C. Cir.2015), the defendant-appellant contended that the trial court had abused its discretion by rejecting a proposed jury instruction that was based on the New Jersey eyewitness identification instructions. *Id.* at 605.   According to the appellant, the trial court erred because it believed "it 'could not instruct the jury on scientific research.' "   *Id.*   However, the court of appeals (D.C.'s highest court) disagreed.    The court stated that:

In our view, the trial court's choice of language provides no indication that it considered itself constrained to reject the scientific research outright. The trial court did not say that it was "precluded" or "prohibited," or that "case law clearly requires exclusion" of such scientific research.   Rather, after hearing defense counsel's arguments, the trial court concluded that it would not be "appropriate" to instruct the jury about research on eyewitness identification that the parties had not presented to the jury.   In choosing to "stick with the Red Book" instructions, the trial court recognized that the proposed instruction differed, in that it extensively referenced research in an "evolving area of law" that was not before the jury, and this difference provided reasonable cause for concern. * * * The trial court's statement that this research "could come before the jury in the form of evidence and it could be rebutted by the government by contrary studies" expresses a clear discretionary preference for the adversary process and constitutes a thoughtful exercise of discretion. This record does not support appellant's

contention that the trial judge was under the legally erroneous view that he was precluded from using the proposed instruction.

*Id.* at 607.[7]

**{¶ 84}** We agree with *Corbin's* approach.   At this stage of legal development in Ohio, the memory science pertaining to witness identification is the proper subject for expert testimony rather than the use of additional or disputed jury instructions.   Here, neither side presented expert testimony, nor did the court call an expert witness using appropriate procedures under Evid.R. 614.   Moreover, the trial court far exceeded the subject of the science of witness memory as it relates to identification.   This is where the precedent exists, not in cases where, as here, identification is not an issue.

**{¶ 85}** "Evid.R. 614(A) and (B) provide that the court may call witnesses or interrogate witnesses, in an impartial manner, whether called by itself or by a party. During a trial, the judge may, in the interest of justice, act impartially in developing facts germane to an issue of fact to be determined by the jury."   *State v. Davis*, 79 Ohio App.3d 450, 454, 607 N.E.2d 543 (4th Dist.1992).   A related jury instruction would be improper in cases where an expert testified, because the court would appear to be vouching for the expert.

**{¶ 86}** This is done in the court's sound discretion, and as " 'long as the court

---

[7] The "Red Book" contained criminal jury instructions for the District of Columbia.   In a footnote, the court of appeals commented that "The District of Columbia's Jury Instructions Committee acknowledged the *Henderson* decision and recent social science studies on eyewitness identification in a comment to its 2013 revision.   *See* Criminal Jury Instructions for the District of Columbia ('Red Book'), No. 9.210 (5th ed. rev. 2013).   It noted, however, that '[t]he Committee is not in agreement over whether, and under what circumstances, additional instruction is necessary that would warn a jury to take care in appraising identification testimony.' * * * This comment was not included in the 2012 revision that was available to the trial judge in the present case." *Corbin* at 605, fn. 23.

maintains its impartiality and does not assume the role of an advocate, such practice does not prejudice the rights of the defendant to a fair and impartial trial.' " *State v. Adams*, 62 Ohio St.2d 151, 157, and fn. 10, 404 N.E.2d 144 (1980), quoting *State v. Weind*, 50 Ohio St.2d 224, 235-236, 364 N.E.2d 224 (1977). "Rule 614(a) simply codifies a judge's well-established common law authority to call witnesses." *U.S. Marshals Serv. v. Means*, 741 F.2d 1053, 1058 (8th Cir.1984) (discussing Fed.R.Evid.614(a), which is identical to Ohio's rule). *See also* 1989 Staff Notes to Evid.R. 614 (indicating that "Rule 614(A) conforms to prior Ohio law where it has been well established that the authority to call witnesses is within the inherent power of the court, the court having a fundamental duty to arrive at the truth").

{¶ 87} The Supreme Courts of New Jersey and Massachusetts formulated their witness identification instructions after receiving input from either a special master or study groups. The Supreme Court of Ohio has not provided us with precedent supporting the use of such instructions. *See State v. Ranzy*, 8th Dist. Cuyahoga No. 97275, 2012-Ohio-2763, ¶ 33 (noting that "*Henderson* is not the law in Ohio, and our supreme court has yet to create any precedent that would allow us as an intermediate court to deviate from *State v. Broom*, 40 Ohio St.3d 277, 284, 533 N.E.2d 682 (1988)"). Accordingly, we agree with the State that the trial court erred in instructing the jury as it did in this case, and the State's assignment of error is sustained.

{¶ 88} As a final matter, we note that the Innocence Project has included an affidavit from an expert in support of its brief. However, "[a] reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d

402, 377 N.E.2d 500 (1978), paragraph one of the syllabus.

### III.   Conclusion

**{¶ 89}** We have sustained the State's assignment of error.   However, this judgment has no impact on Rac's final judgment of acquittal, because he cannot be twice placed in jeopardy.   *State v. Pawelski*, 178 Ohio App.3d 426, 2008-Ohio-5180, 898 N.E.2d 85, ¶ 28 (2d Dist.), citing *State v. Hensley*, 2d Dist. Montgomery No. 18886, 2002 WL 628626 (April 19, 2002).

. . . . . . . . . . . . .

FROELICH, J., concurring:

**{¶ 90}** I concur that the trial court erred and abused its discretion in giving the memory and identification jury instructions in this case.   However, I disagree with the language in the majority opinion suggesting that definitive Supreme Court precedent is always necessary before a court may instruct the jury concerning memory or identification other than precisely as now contained in Ohio Jury Instructions. *See State v. Rac,* 2d Dist. Montgomery No. 27536.

TUCKER, J., concurring:

**{¶ 91}** I concur in Judge Welbaum's opinion and in Judge Froelich's concurring opinion.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Michael T. Gmoser
Lina N. Alkamhawi
Sarah C. Larcade
Elizabeth A. Well
Marcy A. Vonderwell
John K. Carroll
Alexis Agathocleous
Elizabeth Berry
Hon. Steven K. Dankof